## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JAMES MCANDREW,** | : | |
| **Plaintiff** | : | |
| | : | **CIVIL ACTION NO.:** |
| **v.** | : | |
| | : | |
| **BUCKS COUNTY BOARD OF** | : | **2:12-CV-4676-CDJ** |
| **COMMISSIONERS, et al.,** | : | |
| **Defendants** | : | |

| | | |
|---|---|---|
| **WILLIAM J. KLEIN,** | : | |
| **Plaintiff** | : | |
| | : | **CIVIL ACTION NO.:** |
| **v.** | : | |
| | : | **2:12-CV-4809-CDJ** |
| **COUNTY OF BUCKS, et al.,** | : | |
| **Defendants** | : | |

**Jones, J.**

**April 29, 2016**

### MEMORANDUM

Now pending before the Court is Defendants' Motion for Summary Judgment (Dkt No. 31) [hereinafter "MSJ"], Defendants' Statement of Undisputed Material Facts (Dkt No. 33) [hereinafter "Defs.' SUMF"], Plaintiff McAndrew's Joint Response (Dkt No. 41-2 ) [hereinafter "Pls.' Resp."],[1] Plaintiffs' Joint Counterstatement of Material Facts (Dkt. No. 41-1) [hereinafter "CSOF"], Defendant's Reply Brief (Dkt. No. 46) [hereinafter "Rep."], Defendant's Response to Plaintiffs' Counterstatement of Material Facts (Dkt. No. 47) [hereinafter "Defs.' Resp. to CSOF"], and other supporting documents. Defendants move for summary judgment against Plaintiff James McAndrew in his action alleging a violation of his First and Fourteenth Amendment rights to free speech as well as his rights under the Pennsylvania Whistleblower Law.[2] After a thorough review of the motion and the parties' respective briefing, and for the reasons that follow, the Motion will be **GRANTED IN PART, DENIED IN PART.**

---

[1] Plaintiffs McAndrew and Klein filed a joint response to Defendants' separate motions for summary judgment, therefore the Court will refer to that document as, "Pls.' Resp.," even though it only considers Defendants' Motion for Summary Judgment against James McAndrew in this Memorandum Opinion.

[2] The Court notes that this is a consolidated action. (See Consolidation Order, Dkt. No. 24.) This Statement of Facts will, where appropriate, refer to "Plaintiffs," when referencing both McAndrew and Klein.

## STATEMENT OF FACTS

### I.   Plaintiff McAndrew's Background

Plaintiff James McAndrew is a former Bucks County Sheriff's Deputy. (CSOF ¶ 5.) McAndrew began working for the Sheriff's Department on July 30, 2001. (CSOF ¶ 5.)  His initial duties included transporting inmates to and from court; he was later transferred to the Warrant Unit, where he worked between early 2005 and August 2012. (CSOF ¶ 5.) McAndrew and Klein became partners in 2007. (CSOF ¶ 5.) McAndrew was terminated from his employment on February 21, 2012. (CSOF ¶ 5.)

### II.   Plaintiffs' Observed Malfeasance and Ensuing Speech

Plaintiff McAndrew, and his former partner and co-Plaintiff in this consolidated action, William Klein, observed and reported several instances of malfeasance while employed by the Bucks County Sheriff's Department. The allegations explained in greater factual detail below, include: a lack of policies and procedures concerning the use of force, poor vehicle maintenance, a guard sleeping on duty and several instances of corruption.

#### A.   Lack of "Use of Force" Policies and Procedures

Plaintiff McAndrew, and his partner, Plaintiff Klein, both complained about a lack of departmental use of force procedures to their supervisors. (Klein Dep. 59:22-60:4; McAndrew Dep. 139:16-140:15 ,  Nov. 22, 2013, ECF No. 41-6.) Specifically, Klein was concerned that the lack of use of force protocols and guidelines created a risk to the safety of officers and citizens, as well as potential liability for the county. He communicated these concerns to Sheriff Donnelly and Lieutenant Waltman. (Klein Dep. 62:24-63:21.) Although his position did not entail "promulgating, creating, or enforcing policies," Klein began drafting a use of force policy. (Klein Dep. 65:10-12.) Klein, when asked whether he discussed this issue any further with the Sheriff, responded that the "Sheriff told me not to talk to him anymore to go through my chain of command." (Klein Dep. 67:11-15.) When pressed to elaborate, Klein explained that it was not clear whether Donnelly was referring to the use of force issue, or all of Klein's complaints. (Klein Dep. 67: 12-18.)

#### B.   Lapsed and Forged Firearms Certifications

The Court notes that although McAndrew incorporates this complaint into his cause of action, (McAndrew Compl. ¶ 16), he has not provided any record citation supporting the notion

that he actually complained about this issue. (CSOF Part II.A.)  In fact, the CSOF upon which his opposition to Defendant's Motion for Summary Judgment relies only cites to *Plaintiff Klein's* testimony. (CSOF Part II.A.)

Plaintiff Klein, a certified firearms instructor and armorer, learned in early 2010 that a fellow firearms instructor, Lieutenant Thomas French, was not certified to be a firearms instructor. (Klein Amend. Compl. ¶ 17-18; Klein Dep. 38:18-39:20, Oct. 28, 2013, Dkt. No. 41-4.) Klein then raised the issue with a number of departmental personnel, including several other deputies and Lieutenant Thomas Waltman. (Klein Dep. 39:15-40:7.) Sheriff Donnelly, after learning about the certification situation, instructed recertification to be completed "quietly." (Klein Dep. 41:17-24.) Shortly thereafter, Klein learned that Deputy Oliver Groman—one of Bucks County Sheriff Department's certified armorers—approved the certifications of approximately fifty deputies. (Klein Dep. 43:5-44:9.) Klein asserted that he "knew that these certifications were done illegitimately because Groman was not present during range qualifications."[3] (Klein Dep. 43:2-12.) Plaintiff McAndrew also discussed this issue with Defendant Waltman. Sometime later, Klein discussed the issue with David Rouland, an investigator in the Bucks County Controller's Office, and Bucks County Commissioner Diane Ellis-Marseglia. (Klein Dep. 51:4-24.)

### C.  Poor Vehicle Maintenance & Safety

Plaintiff Klein complained about the state of the cars he shared with McAndrew. (Klein Dep. 127:15-128:16.) During their tenure in the Warrant Department, Klein and McAndrew were assigned to three cars, each of which, they contend, was maintained in a state of "disrepair." (Klein Dep. 126:2-4.) At the direction of Lieutenant Waltman, and possibly Corporal Spicer, Klein and McAndrew would submit work orders for their vehicles. (Klein Dep. 135:18-136:7.) Klein testified at his deposition, however, that service was never actually completed; rather, the mechanics "would plug in a scan tool and delete the fault code that sets off your check engine light telling you to service the vehicle." (Klein Dep. 128:8-11.) After driving the vehicle for a short time after servicing, the check engine light would reappear and Klein and McAndrew would take the vehicle to be re-serviced. (Klein Dep. 128:11-16.) Issues seemed to come to a

---

[3] The CSOF also mentions Klein's belief that these certifications were illegitimate because of the short timeframe during which the certifications were granted, it being very difficult to certify approximately fifty officers in only a few days. (CSOF ¶ 16). However, when confronted with the Complaint at his deposition, which contained the original averment on this point, Klein explained that he did not write that statement or understand to what it was referring. (Klein Dep. 44:5-23.)

head in early June of 2011, when Pete McElroy, the individual in charge of departmental vehicle maintenance, complained about the state of Klein and McAndrew's vehicle to other members of the Sheriff's Department. (Klein Dep. 129:24-130:6; 131:4-20.) The issue was ultimately resolved when Klein wrote an email "justif[ying] all the issues that Pete McElroy had raised or at least explain[ing] them." (Klein Dep. 134:19-24.)

Klein also complained that, in his opinion, the assigned vehicles did not meet the standards required by the Pennsylvania Motor Vehicle Code because they did not have sirens or "appropriate lighting." (Klein Dep. 136:12-16.) The lack of sirens or lighting, in Klein's estimation, impeded his ability to respond to "assist officer" calls. [4] (Klein Dep. 137:5-138:2.) Klein testified at his deposition that he "probably" raised this issue with Lieutenant Waltman and Sheriff Donnelly, but they failed to act. (Klein Dep. 136:17-23.) When Chief Shook joined the Department, Klein raised the issue with Shook. (Klein Dep. 136:17-137:5.) Klein went so far as to point the newly hired Chief to a provision of the Motor Vehicle Code Klein believed the Department had been violating, although Klein never identifies with any specificity the provision to which he was referring. (Klein Dep. 136:17-137:5.) Shook directed Klein to use his car's horn to move through traffic. (Klein Dep. 138:4-9.)

### D. Sleeping Deputy

Plaintiff Klein reported that he observed a fellow Sheriff's Deputy sleeping in the courtroom. (Klein Dep. 182:22-183:4.) Klein testified at his deposition that this deputy was "known for being in a courtroom and either doing Sodoku puzzles or sleeping or just basically not doing what he was supposed to be doing." (Klein Dep. 183:9.) After a particular incident where Klein caught this Deputy sleeping, Klein reported the sleeping deputy to Corporal Golder. (Klein Dep. 184:1-2.) When it appeared to Klein that the supervisors were ignoring the issue, Klein followed up with Corporal Prudish. (184:24-185:4.) From Corporal Prudish, the report appeared to work its way up the chain of command—from Corporal Prudish to Corporal Golder, from Golder to Sergeant Wilson, from Wilson to Lieutenant Waltman, and from Waltman to Sergeant Gary Browndorf. (Klein Dep. 185:2-10.) Klein testified during his deposition that Golder, Wilson, and Waltman "went nuts" over the report—criticizing Klein for "ratting out a fellow union member." (Klein Dep. 185:4-15.) Specifically, Klein testified that "Waltman said

---

[4] Klein describes an "assist officer" call as "about the most serious call you can get on your radio." (Klein Dep. 137:11-12). During an assist officer call, "[the issuing law enforcement officers] hit an emergency button and they're in a fight for their life somewhere." (Klein Dep. 137:12-14).

that Klein is up here starting trouble…And he was apparently in the office saying that I was going to be fired for ratting out a fellow union member." (Klein Dep. 185:12-15.)

### E. Corruption

Plaintiff McAndrew, and his partner, Klein, complained about four different types of perceived "corrupt" activity in which they were forced to participate: (1) monitoring the political activity of fellow deputies, (2) receiving county funds for distributing Sheriff Donnelly's campaign material at public events, (3) assembling and posting political signs throughout Bucks County in support of Sheriff Donnelly's campaign, and (4) fixing mechanics' estimates for department vehicle repair.[5]

First, Plaintiffs complained that they were directed by departmental leadership to ascertain whether their colleagues supported Sheriff Donnelly's re-election. (Klein Dep. 71:8-12; McAndrew Dep. 64:18-21, 76:3-23.) Specifically, Klein alleged that Sheriff Donnelly called Sergeant Gary Browndorf—Klein and McAndrew's supervisor—to ask Browndorf to direct "one of his guys" to observe a deputy's lawn. (Klein Dep. 71:5-9.) The purpose of the observation, Klein alleges, was to determine whether the deputy in question had a lawn sign supporting Sheriff Donnelly's election opponent. (Klein Dep. 71:8-12; 75:2-4.) Browndorf then asked McAndrew to carry out the Sheriff's request. McAndrew, with Klein, complied. (Klein Dep. 75:19-20.) McAndrew later complained to Sergeant Wilson, and, along with Klein, to Defendant Marseglia. (McAndrew Dep. 78:24-79:6; Marseglia Dep. 48:20-49:1, Dkt No. 41-9.) When McAndrew did complain to Wilson, McAndrew testified that Wilson told him that, "If [McAndrew] didn't like [going to his coworkers' houses] there was [sic] forty other people who would love to have my job that would do it." (McAndrew Dep. 79:16-23.)

Second, Plaintiffs complained that they were paid "comp time" from the county treasury to walk in parades and hand out campaign material for Sheriff Donnelly. (Klein Dep.80:14-23; McAndrew Dep. 65:3-6.) Klein testified that, although departmental supervisors typically looked for "volunteers" to attend public events in support of Sheriff Donnelly's reelection, supervisors would provide "some kind of reward for helping out" at these events and that the culture of the department dictated that deputies "better say yes" to such requests. (Klein Dep. 80:14-23.) McAndrew testified similarly, explaining that he complained to Defendant Marseglia that county

---

[5]The fifth type of corruption alleged by Plaintiffs is a repeat of the allegation concerning the lapsed firearms certifications described in Part I.A. (CSOF ¶ 34(d)). Plaintiffs do not add any further substance to their allegation in ¶ 34(d), thus the contents of that allegation need not be repeated here.

money was paid to him for walking in parades and passing out campaign materials in support of Sheriff Donnelly's re-election. (McAndrew Dep., 72:9-13.)

Third, Plaintiff McAndrew complained that he was directly ordered by Sheriff Donnelly to assemble and post political signs supporting Donnelly throughout Bucks County. (McAndrew Dep.72:16-73:3.) According to McAndrew's deposition testimony, Sheriff Donnelly called McAndrew and Sergeant Browndorf into his office, and directed the two deputies to report to Republican Party headquarters in their personal vehicles and plain clothes. (McAndrew Dep. 72:16-20.) At Republican Party headquarters, the two deputies found boxes of campaign signs with Sheriff Donnelly's name on them. (McAndrew Dep. 72: 21-23.) It was the deputies' job to assemble "hundreds" of signs, post them throughout the county, and then inform Sheriff Donnelly where each was located. (McAndrew Dep. 72:23-73:3; 73:24-74:1.) Although McAndrew was initially uncomfortable with this request, he did not complain officially until his discussion with Defendant Marseglia in November of 2010. (McAndrew Dep. 74:18-75:18.)

Fourth, Plaintiff Klein and McAndrew complained that Corporal George Spicer was engaged in the fixing of body shop estimates for the repair of damaged departmental vehicles. According to McAndrew, it was departmental policy to obtain three estimates for any body work needed on a Sheriff's Department vehicle, and use the lowest of the three estimates. (McAndrew Dep. 88:6-7.) On one occasion, McAndrew and Klein took a vehicle to be repaired at Davidson's, a garage in Bucks County. (McAndrew Dep. 88:8-12.) The mechanic asked to see the other bids McAndrew and Klein had received to repair the vehicle. (McAndrew Dep. 88:12-15.) When the deputies refused to show the mechanic the other estimates, the mechanic contacted Corporal Spicer. (McAndrew Dep. 88:22-24.)

Spicer, via cellphone, directed McAndrew and Klein to obtain two other estimates, and then return to Davidson's garage. (McAndrew Dep. 88:24-89:2.) Ultimately, they returned to Davidson's with two other bids—one for $3,500 and one for $750. (McAndrew Dep. 88:8-9.) When the mechanic asked to see the bids, the deputies refused his request. (McAndrew Dep. 89:9-10.) Again, the mechanic called Corporal Spicer, who directed McAndrew to throw away the $750 estimate, and give the mechanic the car so that the mechanic could obtain a fourth, higher estimate. (McAndrew Dep. 89:11, 19-24.) McAndrew reported this incident to Sergeant Browndorf, who instructed him to report the incident to Lieutenant Waltman. (McAndrew Dep. 90:6-9.) When McAndrew did so, Lieutenant Waltman told McAndrew that "if [McAndrew]

didn't like the way George [Spicer] did things out on the road that [McAndrew] could work in the holding cell starting tomorrow." (McAndrew Dep. 90:14-17.) McAndrew informed Defendant Marseglia about the incident. (McAndrew Dep 90:11-13.)

### F.  The Rouland Investigation[6]

After speaking with Plaintiffs about their complaints, Commissioner Marseglia scheduled a meeting between Plaintiffs and David Rouland, an investigator employed by the Bucks County Controller's Office. (CSOF ¶ 57; Defs.' Resp. to CSOF ¶ 57.) Approximately six weeks after their initial contact with Marseglia, Plaintiffs met with Rouland. (McAndrew Dep. 99:5-6, 100:2-7.) McAndrew testified during his deposition that he and Klein discussed all the issues mentioned above with Rouland, including the political signs, driving by deputies homes (to check for signs), walking in parades, the body shop estimates, and the firearms issue. (McAndrew Dep. 100:8-14.) Rouland allegedly took notes during the meeting, and, when the meeting concluded, informed Plaintiffs that he would "get back to [Klein and McAndrew]." (McAndrew Dep. 100:5-7; see also Rouland Dep. 21:6-9, Dkt No. 38-12 (describing the procedure by which Rouland would complete his investigatory reports).)

After the meeting with Plaintiffs, Rouland informed Plaintiffs that he relayed their complaints to his boss—Bucks County Controller Raymond F. McHugh. (McAndrew Dep. 113:8-11.) Defendant Marseglia also testified that she compiled Plaintiffs' complaints and gave them to the Controller. (Marseglia Dep., 23:21-24, ECF No. 41-9.) Controller McHugh testified that he spoke to Rouland about Plaintiffs' complaints and decided that some of the issues raised did not merit further investigation. (Defs.' Resp. to CSOF ¶ 68.) Rouland later resigned from the Controller's Office. (Rouland Dep. 31:24-32:14.)[7]

---

[6] The CSOF asks the Court to draw a negative inference against Defendants for failing to supply all the written documents that Plaintiffs allege were created during the Rouland investigation. (CSOF ¶ 72). It is not clear from the record that reports corresponding to Rouland's interviews with Sheriff's Department personnel ever existed. However, Defendants do admit that Rouland "often interviewed witness [sic], took notes, and prepared reports which he put in a three ring binder." (Defs.' Resp. to CSOF ¶ 69).

[7] Plaintiffs imply that Rouland resigned from the Controller's Office because Controller McHugh ordered Rouland to cease his investigation into Plaintiffs' complaints. (CSOF ¶ 62 ("McHugh Instructed Rouland not to investigate Plaintiffs' complaints of corruption. Rouland subsequently resigned after McHugh told him to cease his investigation.").)   This implication is refuted by Rouland's deposition testimony, where he states that any such allegation would be "absolutely false." (Rouland Dep. 60:11-16). Mr. Rouland testified that he resigned in the wake of his brother's death. (Rouland Dep. 31:24-32-14).

### III.    Events Preceding the Termination of Plaintiffs McAndrew and Klein

#### A.   Browndorf Grievance Hearing

On February 14, 2011, Plaintiffs McAndrew and Klein testified at a disciplinary hearing concerning Sergeant Browndorf's conduct. (CSOF ¶ 38; Defs.' Resp. to CSOF ¶ 38.) Plaintiffs assert that their testimony at the hearing, along with their numerous complaints about departmental problems, forms the basis of Defendants' alleged retaliation. (CSOF ¶ 43.) Plaintiffs allege in their Complaint that Lieutenant Waltman "screamed at them, telling them he would not pay [Plaintiffs] overtime for their testimony" at the Browndorf hearing. (CSOF ¶ 39 (citing Am. Compl. ¶ 47).)  Ultimately, Plaintiff McAndrew was paid for his testimony during the hearing. (McAndrew Dep. 127:1-2.)

#### B.   July 26, 2011 Incident

On July 26, 2011, the Bucks County Sheriff Department's Warrant Unit, of which Klein and McAndrew were apart, was assigned to serve an arrest warrant on Phillip Romanek at the residence of his girlfriend, Samantha Doneker. (CSOF ¶ 73.)[8] Several members of the Bucks County Sheriff's Department were present at Doneker's residence, including Sergeant Browndorf, Corporal Prudish, Deputy Daniel Boyle, and Plaintiffs Klein and McAndrew. (CSOF ¶ 74.) The group surrounded the residence and began knocking on doors and windows. (CSOF ¶ 75.) Doneker subsequently allowed the deputies to enter her residence, and conduct a search for Mr. Romanek. (CSOF ¶ 76; Defs.' Resp. to CSOF ¶ 76.) During the search, Plaintiff Klein and Deputy Boyle became aware that Mr. Romanek was hiding in Doneker's attic. (CSOF ¶ 77.)

Deputy Boyle entered the attic and handcuffed Mr. Romanek, while Klein remained below in a closet that contained a hole that served as the attic's entrance. (CSOF ¶ 78.) Plaintiff Klein then prepared to receive Mr. Romanek through the hole. (CSOF ¶ 78.) At some point while Boyle and Klein were apprehending Mr. Romanek, Sergeant Browndorf arrived on the scene. (CSOF ¶ 79.) While Boyle lowered Romanek through the attic hole to Plaintiff Klein, Sergeant Browndorf stood behind and to the right of Klein. (CSOF ¶ 81.) At some point while Boyle and

---

[8] In several places in their Response to Plaintiff's CSOF, Defendants do not issue specific denials of Plaintiffs' allegations. <u>See, e.g.</u>, Defs.' Res. to Pls.' CSOF ¶ 73 ("Admitted that Plaintiff Klein so testified."). According to this Court's rules, "all facts set forth [in a party's statement of undisputed facts] shall be deemed admitted unless addressed by the opposing party." Policies and Procedures for Judge C. Darnell Jones, II, Civil Cases Section D.4 (available at https://www.paed.uscourts.gov/documents/procedures/jonpol.pdf). Because Defendants have not "addressed" the underlying allegation (instead, merely acknowledging how that allegation entered into evidence), this Court's rules and Federal Rule of Civil Procedure 56(e)(2) dictate that the allegations answered in the fashion of Paragraph 73 be deemed admitted.

Klein were lowering Romanek, Browndorf struck Romanek over Klein's right shoulder. (CSOF ¶ 85.) Klein then heard Browndorf claim that Romanek had kicked him. (CSOF ¶ 86.) According to Plaintiff McAndrew's testimony, Browndorf later claimed that Romanek had kicked him during the extraction from the attic. (CSOF ¶ 92.) After Browndorf's blow, Klein brought Romanek to the floor and passed him to Plaintiff McAndrew and Corporal Prudish, who had just arrived on scene. (CSOF ¶ 93.)

Sometime shortly after securing Romanek inside the house, Klein testified that he heard Doneker begin to scream that Romanek had been struck by Browndorf. (Pls.' Joint CSOF ¶ 95.) Plaintiffs and Corporal Prudish then exited the residence while Sergeant Browndorf remained inside the house. (CSOF ¶ 96.)   Klein testified subsequently that he heard yelling and then witnessed Browndorf escort Doneker out of the residence in handcuffs. (CSOF ¶ 97.) Neither Plaintiff Klein nor Plaintiff McAndrew saw the interaction between Browndorf and Doneker inside the house. (CSOF ¶ 97, 100.) Both Romanek and Doneker were subsequently arrested and charged with aggravated assault on Sergeant Browndorf. (Grand Jury Test. of William Klein 69:9-15, Dkt No. 41-22.)

After the incident, none of the Deputies present filed an accurate report because, according to Klein, the "accepted practice" of the Sheriff's Department was to only file an incident when a supervisor would specifically request that the deputies do so. (CSOF ¶ 109.) In this case, Plaintiffs' supervisor, Sergeant Browndorf, never requested that such a report be filed. (CSOF ¶ 110.) Plaintiffs subsequently testified about the incident before a grand jury on September 22, 2011. (CSOF ¶ 113.) They also discussed the events of July 21, 2011 with Chief Shook, who conducted an internal inquiry into the deputies' conduct on that day. (Pls.' Joint CSOF ¶ 113.)

### C.  Subsequent Investigation

Chief Shook, after discussing with Sheriff Donnelly, launched an investigation into the conduct of the deputies present during the July 26 incident. (Shook Dep. 172:8-22, Dkt No. 41-11.) Specifically, Chief Shook testified at his deposition that he and Sheriff Donnelly decided that Shook "should investigate everyone that was there and find out what happened and why no reports were made." (Shook Dep. 172:14-18.)

After his conversation with Donnelly, Chief Shook separately interviewed Plaintiff McAndrew and Deputy Boyle in the presence of union representative Deputy Christopher Lang.

(CSOF ¶¶ 116-17; Defs.' Resp. to CSOF ¶¶ 116-17.) Lang, when asked whether he felt Chief Shook conducted the interviews differently, responded that "the only thing that specifically stands out in my mind was the questions that were asked of Deputy McAndrew were more – I guess interview or interrogation style, whereas Deputy Boyle's interview was more yes-and –no questions." (Lang Dep. 11:9-17, ECF No. 41-12.) Deputy Lang testified further that he felt that Chief Shook was "soft" on Boyle during his interview, and "harder" on McAndrew during his interview. (Lang Dep. 13:7-10, ECF No. 41-12.)  Ultimately, Boyle testified that he was not disciplined for failing to report Romanek and Doneker's complaints. (Boyle Dep. 41:19-24.)

The parties dispute the credibility of Shook's investigation. (*Compare* CSOF Part VII.F, *with* Defs'. Resp. to Pls.' CSOF Part VII.F.) Plaintiffs allege several facts that, in their opinion, undermine the credibility of Shook's investigation. These allegations include: Shook's failure to review Klein and McAndrew's actual testimony before the Browndorf grand jury, Shook's failure to interview Romanek or Doneker, and Shook's failure to thoroughly question McAndrew and Klein about their positions relative to Browndorf and Romanek during the incident. (CSOF ¶¶ 146, 150, 152.) Plaintiffs also rely on expert testimony in support of their position. (CSOF ¶ 160). For their part, Defendants Donnelly and Shook admit that Shook only read the Browndorf grand jury presentment and summaries of Plaintiffs' testimony, Shook never interviewed Romanek or Doneker during the course of his investigation, but deny that Shook did not thoroughly question McAndrew and Klein. (Defs.' Resp. to CSOF   ¶¶ 146, 150, 152.) Defendants also deny that Plaintiffs' expert's report and conclusions are admissible. (CSOF ¶ 160.)

### D.  Reporting Policy Dispute

Plaintiff McAndrew disbelieves the Shook investigation because Sheriff Donnelly knew that "no one ever in the history of the department under his supervision wrote [an incident] report." (CSOF Part VII.C, p.22.) The parties agree that, at the time of the Shook investigation, there was no *written* policy or procedure for reporting the use of force in the Sheriff's Department. (CSOF ¶ 125; Defs.' Resp. to CSOF ¶ 125.)  The parties disagree, however, about whether the Sheriff's Department had a *verbal* reporting policy. (*Compare* CSOF  ¶ 127, *with* Defs.' Resp. to CSOF ¶ 127.) Plaintiffs cite the deposition testimony of Corporal Prudish, who stated that "the [reporting] policy is whenever you use force or observe force is whatever the sergeant tells you." (CSOF ¶ 127; Prudish Dep. 19:13-19, Dkt No. 41-18.) When asked, Prudish

confirmed that "if the sergeant didn't tell [him] to write [an incident] down, or didn't saying anything and remained silent" he would "do nothing." (Prudish Dep. 19:23-20:2.)

In response, Defendants point to the testimony of Sheriff Donnelly. Sheriff Donnelly testified at his deposition that the department had a "verbal policy that if there [was] an incident, a report [was] to be filled out." (Donnelly Dep. 27:11-14.) Donnelly testified further that he could not remember seeing a single document recording "a use of force" between 2003 and 2012, and was not aware of the occurrence of any incident that would implicate the alleged verbal policy. (Donnelly Dep. 222:18-223:4, 224:4-15.)

### E.  Corporal Prudish's Malfeasance & Discipline

Browndorf, with Corporal Prudish's assistance, created a false report of the July 26 incident, which they then sent to Sheriff Donnelly via email on July 26, 2011. (Pls.' Joint CSOF ¶¶ 128-38; Defs' Resp. to CSOF ¶¶ 128-38.)

Although he received the email with the report on the day of the incident, Sheriff Donnelly did not advise Shook that he had an email from Browndorf with the false report until November 28, 2011. (CSOF ¶ 129; Defs.' Resp. to CSOF ¶ 129.) After he received the report, Shook compared the report to his notes from his interview with Corporal Prudish. (CSOF ¶ 130; Defs.' Resp. to CSOF ¶ 130.) Shook discovered that Prudish stated that, during his interview, no report was ever written about the incident. (CSOF ¶ 131; Defs.' Resp. to CSOF ¶ 131.)

The day after receiving the Prudish report, Chief Shook went to the Bucks County District Attorney's Office. (CSOF ¶ 133; Defs.' Resp. to CSOF ¶ 133.) Shook, with an Assistant District Attorney, reviewed Prudish's grand jury testimony, where Prudish also claimed that no incident report was ever written. (CSOF ¶ 134; Defs.' Resp. to CSOF ¶ 134.) When confronted, Prudish admitted that "Browndorf dictated what Prudish was to write [in the report], and directed Prudish to copy what was written from the Affidavit of Probable Cause prepared by Browndorf." (CSOF ¶ 136; Defs.' Resp. to CSOF ¶ 136.)

Ultimately, Prudish was caught in two misrepresentations. First, the report, authored by Browndorf through Corporal Prudish, repeated the falsehood that Romanek kicked Browndorf during the arrest. (CSOF ¶ 137; Defs.' Resp. to CSOF ¶ 137.) Second, Corporal Prudish stated—both to Chief Shook and during grand jury testimony—that no incident report was ever filed for the July 26 incident, even though Prudish authored the fictitious report on the day of the incident. (CSOF ¶ 137; Defs.' Resp. to CSOF ¶ 137.) As punishment for his complicity in drafting the

fictitious report and his subsequent false statements, Shook recommended that Prudish be suspended for five days and demoted. (CSOF ¶ 138; Defs.' Resp. to CSOF ¶ 138.)

Chief Shook drafted a memorandum to Sheriff Donnelly on February 12, 2012 sharing his findings and making several recommendations for further action. (Ex. O in Support of Pls.' Resp. to Defs.' Mot. Summ. J. 1, ECF No. 41-19.) Chief Shook recommended that the Sheriff suspend and demote Corporal Prudish, and terminate Plaintiffs Klein and McAndrew. (Pls.' Ex. O 4-5.) The report does not explicitly state, but clearly implies, that Shook recommended termination for McAndrew and Klein because they failed to report Browndorf's crimes. (Pls.' Ex. O 4-5.)

### F.  Plaintiffs' Termination & the "Conflicting" Justifications

On February 21, 2012, Plaintiff McAndrew received notice of his termination from the Buck's County Sheriff's Department. (Ex. U in Support of Pls.' Resp. to Defs.' Mot. Summ. J. 6-7, ECF No. 41-25.) Plaintiff Klein received notice of his termination on March 8, 2012. (Ex. U 2, 5.)

The Parties agree that Sheriff Donnelly was the final decision-maker with respect to Plaintiffs' termination. (CSOF ¶ 161; Defs.' Resp. to CSOF ¶ 161.) However, the Parties dispute whether Defendants provided a consistent justification for terminating Plaintiffs. (*Compare* CSOF Part VIII, *with* Defs.' Resp. to CSOF Part VIII.)

Plaintiffs allege that there were no less than five different reasons provided for their termination. (CSOF Part VIII.) First, Plaintiffs point to Defendant's Motion for Summary Judgment Against Klein (ECF No. 32.) In the Motion, Defendants state that Sheriff Donnelly concurred with Chief Shook's report that Klein and McAndrew violated their oath to uphold the constitutions of the United States and Commonwealth of Pennsylvania by failing to "act on" Browndorf's crimes. (Pls.' Joint CSOF ¶ 162.)  Defendants assert that the language from the Motion supports their position that McAndrew and Klein were terminated for failing to report Browndorf. (Defs.' Resp. to CSOF ¶ 162-64.)

Second, Plaintiffs point to Sheriff Donnelly's deposition testimony, where the Sheriff agreed that his belief that McAndrew and Klein lied about what they saw on July 26, 2011 influenced his (the Sheriff's) decision to terminate Plaintiffs. (CSOF ¶ 165.) Defendants only admit that Plaintiffs accurately quoted Sheriff Donnelly's deposition testimony. (Defs.' Resp. to CSOF ¶¶ 165-66.)

Third, Plaintiffs point to the termination letters they received from Bucks County. (Pls.' Joint CSOF Part VIII.A.3.) Those letters state that Plaintiffs violated their oath to uphold the United States and Pennsylvania Constitutions by submitting false documents to county detectives. (CSOF ¶¶ 167, 171.) The Parties agree that Donnelly did not have anything to do with writing the termination letters, and that Donnelly did not know who drafted the termination documents. (CSOF ¶ 168; Defs.' Resp. to CSOF ¶ 168.) Defendants also concede that Plaintiffs never submitted any written documentation of the arrests of Romanek and Doneker. (Defs.' Resp. to CSOF ¶ 172.) However, Defendants deny that the submission of false documentation was a factor in Plaintiffs' terminations. (Defs.' Resp. to CSOF ¶ 171.)

Fourth, according to Plaintiffs, Plaintiffs were terminated because they were aware of Prudish's false report. (CSOF ¶¶ 175-77.) Defendants respond that Sheriff Donnelly testified that he *believed*, but did not *know*, that Plaintiffs were aware of Prudish's false report, and that that belief "probably" factored into his decision. (Defs.' Resp. to CSOF ¶ 175-76.)

Fifth, and finally, Plaintiffs point to Sheriff Donnelly's deposition testimony, where Donnelly testified that he agreed with Shook's investigation and believed that the facts found supported a decision to terminate McAndrew and Klein. (CSOF ¶ 179.) Plaintiffs also allege that Sheriff Donnelly may never have reviewed the Shook report. (CSOF ¶ 180.) Defendants admit that Donnelly relied on Shook's investigation and reiterate Donnelly's belief that the facts Shook found supported a decision to terminate Plaintiffs. (Defs.' Resp. to CSOF ¶ 179.) Defendants respond further by pointing out that Donnelly stated that he could not testify that he reviewed Shook's investigation, not that he did not ever review it. (Defs.' Resp. to CSOF ¶ 180.)

## IV.     Alleged Retaliatory Acts

Plaintiffs allege that they were subjected to no less than fifteen retaliatory actions or threats of action by various members of the Bucks County Sheriff's Department. (CSOF ¶ 43(a-n).) These alleged actions or threats, explained in greater detail below, include refusing to award commendations, assigning Plaintiffs to nonfunctional vehicles, and shutting off Plaintiffs access to fuel for their vehicles.

### A.  Purple Heart Denial

Plaintiff Klein alleges that Sheriff Donnelly retaliated against him by refusing to award Klein a purple heart for an injury Klein sustained in the line of duty at the "end of 2010." (Pls'.

Joint Counter-Statement of Material Facts ¶ 43(a).) On October 15, 2010, Klein and several other officers attempted to apprehend a wanted individual at the individual's residence. (Klein Dep. 146:5-8.) When Klein and another deputy approached the front door, they found the target of the warrant armed with two knives. (Klein Dep. 146:12-19.) A fight ensued, and Klein was stabbed in the jaw. (Klein Dep. 146:19-147:5.) Klein apprehended the individual, and was then taken to the hospital. (Klein Dep. 146:22-23.) After the incident, Klein was awarded a law enforcement commendation by the Bucks County Board of Commissioners. (Klein Dep. 148:21-24.) Klein was also recommended for a purple heart by Sergeant Browndorf. (Klein Dep. 147:21-24.) However, he never received the award. (Klein Dep. 148:11-15.) Klein overheard a conversation between Browndorf and Donnelly's secretary, Jennie McLure, where McLure told Browndorf that Donnelly refused to approve the order for the Purple Heart. (Klein Dep. 149:9-24.)

### B. Software Discontinuation

Plaintiffs allege that Defendants retaliated against them by terminating Plaintiffs' access to warrant search software in their departmental vehicle between February and April of 2011. (CSOF ¶ 43(b).) During his deposition, Klein explained that the address-verifying software was integral to serving warrants because the warrant targets would not often list their real address on public documents. (Klein Dep. 95:10-16.)  In order to avoid wasting time investigating locations where the target of the warrant did not live, the deputies would utilize this software. (Klein Dep. 95:16-22.) When the Sheriff's Department terminated Klein and McAndrew's access (and, according to Klein, only their access), the two deputies claimed that they "were walking around basically blind." (Klein Dep. 95:22-24; 97:16-18.) Access was, allegedly, never restored. (Klein Dep. 97:19-20.)

### C. Paperwork

In March 2011, Plaintiffs allege that Lieutenant Waltman began "accusing Plaintiffs of not submitting their paperwork to him, despite other supervisors receiving it." (CSOF ¶ 43(c) (citing Ex. F in Support of Pls.' Resp. 8, ECF No. 41-10).)[9] Klein testified at his deposition that this "had never been an issue prior to the complaints being made." (Klein Dep. 100:14-15.) Klein testified at his deposition that his pay was never reduced, nor was he ever threatened with a

---

[9] Exhibit F is a timeline of events prepared by Plaintiff McAndrew. The timeline is contained in email from McAndrew to the email address "wjfox@aol.com." (Ex. F at 1.) This appears to be the personal email address of Klein's attorney, William Fox. (Ex. F at 1.) McAndrew sent this to Mr. Fox on May 23, 2012 and forwarded it to Plaintiff Klein the following day. (Ex. F at 1.) It appears from the exhibit that McAndrew also forwarded the email to his father. (Ex. F at 1.)

reduction in pay, over the paperwork issue. (Defs.' Resp. to CSOF ¶ 43(c) (citing Klein Dep. 104:18-22).)

### D.   Unit History Check

In April 2011, Waltman began to print out and review Plaintiffs' unit history. (CSOF ¶ 43(d); Defs.' Resp. to CSOF ¶ 43(d).) Plaintiffs allege that Waltman had never done this before Plaintiffs' testified at a grievance hearing for Sergeant Browndorf in February 2011. (CSOF ¶ 43(d); Defs.' Resp. to CSOF ¶ 43(d).) Defendants deny that the unit history check was retaliatory. (Defs.' Resp. to CSOF ¶ 43(d).)

### E.   Assignment to Poorly Maintained Vehicles

Plaintiffs allege that, throughout the "majority of 2011," they were assigned to "multiple malfunctioning vehicles." (CSOF  ¶ 43(e) (citing (Klein Dep. 125:22-126:4).) According to Plaintiff McAndrew, Plaintiffs took their vehicle to the county garage on several occasions, but the necessary repairs were not made. (CSOF  ¶ 43(e) (citing Ex. F at 11).) Plaintiffs allege further that "Waltman and Spicer told the Sheriff in March 2011 not to give Plaintiffs a functioning vehicle." (CSOF ¶ 43(e) (citing Ex. F. at 8).)

Defendants deny Plaintiffs' characterization of their vehicle as "malfunctioning," that the vehicle assignments were retaliatory, and that Defendants told the Sheriff not to give Plaintiffs a functioning vehicle. (Defs.' Resp. to CSOF ¶ 43(e).) Defendants also point to Plaintiff Klein's deposition testimony, where he conceded that Plaintiffs received a replacement car "probably immediately after" they complained in June 2011. (Defs.' Resp. to CSOF  ¶  43(e) (citing Klein Dep. 133:9-12.)

### F.   GPS Tracking of County Vehicle

According to Plaintiff McAndrew, Waltman used GPS to monitor the whereabouts of Plaintiffs' county vehicle in the wake of the Browndorf disciplinary hearing. (Pls.' CSOF ¶ 43(f) (citing Ex. F at 10).) McAndrew also claims that "Waltman admitted to not tracking other deputies' vehicles." (CSOF ¶ 43(f) (citing Ex. F at 10).) During this same conversation, McAndrew also claims that Waltman "chastised McAndrew for Plaintiffs' alleged failure to properly care of [sic] their vehicle." (CSOF ¶ 43(f) (citing Ex. F at 10).)

In McAndrew's deposition testimony, McAndrew explained that the GPS incident arose after he used his personal vehicle to report to work, and then picked up his county vehicle at some point later in the morning. (McAndrew Dep. 171:5-23.) McAndrew testified further that he

was never reprimanded in connection with the personal vehicle issue. (McAndrew Dep. 172:15-20.) Finally, with respect to the maintenance issue, Klein admitted that Waltman only spoke to Browndorf about the condition of Plaintiffs' vehicle after Waltman was informed by McElroy about the vehicle's issues. (Klein Dep. 132:12-21; see also Part I.D for a full explanation for the vehicle issues.)

### G. Gas Keys & Cards

According to Plaintiff Klein, in July 2011, Plaintiffs' access to gasoline for their official vehicle was totally restricted when their gas keys (which allowed them to obtain fuel in Lower Bucks County) and their gas cards (which allowed them to obtain fuel in Doylestown) were "shut off." (CSOF ¶ 43(g) (citing Klein Dep. 138:16-21).) Klein has admitted that it "wasn't uncommon" for there to be problems from time to time with the gas keys. (Defs.' Resp. to CSOF ¶ 43(g) (citing Klein Dep. 140:13-17).)

### H. Aircard Access

Also in July 2011, Plaintiffs allege that they were further retaliated against when their aircard was shut off. (CSOF ¶ 43(h).) This prevented Plaintiffs from remotely connecting to the Sheriff's Department's online network and made it more difficult for them to submit paperwork, run drivers' licenses and license plates, and determine the validity of warrants. (CSOF ¶ 43(h) (citing Klein Dep. 99:17-18; 110:17-20).) Klein admitted there were "widespread" issues with the Department's air cards. (Defs.' Resp. to CSOF ¶ 43(h) (citing Klein Dep. 99:5-6).)

### I. Waltman's Criticism

Plaintiffs allege that Defendant Waltman retaliated against them when he "began criticizing Plaintiffs for failing to sign in and out, and for other minor issues not previously raised prior to their complaints." (CSOF ¶ 43(i) (citing Klein Dep. 116:12-22).) Klein admitted that Plaintiffs were neither disciplined nor docked pay in relation to Waltman's complaints about their conduct. (Defs.' Resp. to CSOF ¶ 43(i) (citing Klein Dep. 117:13-18).)

### J. Mobile Data Terminal

Plaintiffs allege that, in August 2011, Waltman refused to replace or service the nonfunctional Mobile Data Terminal in Plaintiffs' vehicle. (Klein Dep. 98:19-20.) Klein testified that he and McAndrew complained about the situation to Lieutenant Waltman, Deputy Groman, Sergeant White, and the Sheriff Department's IT department. (Klein Dep. 98: 17-99:1.) Sometime later, Plaintiffs did receive a new computer from Sergeant White. (Klein Dep. 103:7-

8.) However, this computer was ultimately either taken away or stopped functioning. (Klein Dep. 103:8-9.) Defendants deny that Waltman refused to replace the nonfunctional mobile data terminal. (Defs.' Resp. to CSOF ¶ 43(j).) Klein admitted that "there were intermittent issues with computers as there are with all electronic devices." (Klein Dep. 99:2-13.)

### K. Vacation Days

Plaintiffs allege that Lieutenant Waltman denied Plaintiffs' request for vacation time in retaliation for their complaints. (CSOF ¶ 43(k) (citing Klein Dep. 178:12-14).)

### L. Transfer to Detention Unit

On August 24, 2011 Lieutenant Waltman transferred Plaintiffs from the Warrant Unit where they had been working to the Detention Unit. (Ex. F 14.)  This transfer was announced just hours after Klein emailed Sergeant White to tell White that Plaintiffs intended to file an official complaint against Waltman. (Ex. F 13-14.) Chief Shook, in the midst of a departmental shake-up, made Plaintiffs' transfer to the Detention Unit permanent. (Shook Dep. 81:4-82:7.) According to Deputy Lang, the road assignments—where Plaintiffs had been working—were considered the best assignments and holding cell duty, to which Plaintiffs had been transferred, was the worst. (Lang Dep. 21:2-12.) Lang also testified that, if a deputy "violate[s] a specific policy, they are removed from the road and brought back in the holding cell." (Lang Dep. 21:13-21.) McAndrew admitted that "it's not like everybody hates" working in the holding cell. (Defs.' Resp. to CSOF ¶ 43(l) (citing McAndrew Dep. 199:23-24).)

### M. Shift Request Denials

According to Plaintiffs, they were the "only deputies out of approximately 50 who were denied the shifts they requested" in December 2011. (CSOF ¶ 43(m) (citing Klein Dep. 176:11-12).) Plaintiff McAndrew also claims that he was told by another deputy that, when discussing the shift denial issue Chief Shook, Shook told this other deputy that he "he had his reasons" for denying Plaintiffs' requests. (Ex. F at 20.)

### N. Armory Key

Plaintiff Klein also claims that Defendants retaliated against him by taking away his key to the armory. (Klein Dep. 179:23-182:18.)

## PROCEDURAL HISTORY

Plaintiff McAndrew filed the complaint in the instant matter on August 15, 2012. (McAndrew Compl., Case No. 12-cv-4676, Dkt No. 1) [hereinafter, McAndrew Compl.] Before

consolidating this action with the action brought by his partner, William Klein (Consolidation Order, Case No. 12-cv-4676, Dkt. No. 24), this Court issued separate Memoranda Opinions adjudicating Defendants' Motions to Dismiss against Plaintiff McAndrew and Plaintiff Klein respectively (Klein Mem. Op., Case No. 12-cv-4809, Dkt No. 23, April 1, 2013; McAndrew Mem. Op., Case No. 12-cv-4676, Dkt No. 11, Nov. 8, 2013 [hereinafter, McAndrew Mem. Op.].)

At present, McAndrew's Complaint consists of two counts: a deprivation of his First and Fourteenth Amendment right to free speech pursuant to 42 U.S.C. § 1983, and a violation of the Pennsylvania Whistleblower Act. (McAndrew Amended Compl.)

At the Motion to Dismiss stage, the Court considered nine of Plaintiff McAndrew's statements: (1) in or around June of 2010, Plaintiff notified Defendant Waltman that Sergeant George Spicer had rigged bids with an auto-body repair shop regarding damaged Sheriff's vehicles; (2) in or around late 2010, Plaintiff learned that Ollie Groman falsely certified that certain Deputies had received training when they had not, and notified Defendant Waltman; (3) Plaintiff complained to Defendant Waltman about a lack of use of force policies and written procedures governing Deputy job performance; (4) In or around November of 2010, Plaintiff notified County Commissioner Ellis-Marseglia of corruption; (5) In early 2011, Plaintiffs McAndrew and Klein discussed the details of the corruption with Investigator Rouland; (6) On February 14, 2011 Plaintiff McAndrew testified at Sergeant Browndorf's grievance hearing; (7) On August 24 2011, Plaintiff informed Sergeant White that Plaintiff would be filing a retaliation complaint against Defendant Waltman; (8) Plaintiff McAndrew testified before the Browndorf Grand Jury; and (9) On or about February 10, 2012, Plaintiff McAndrew answered questions in the course of the Shook investigation into the July 26, 2011 events. (McAndrew Mem. Op. 9-10.)

In the Court's November 8, 2013 Memorandum Opinion, the Court noted that Defendants challenged the extent to which Plaintiff McAndrew complained as a citizen, and not as a government employee.[10]   (McAndrew Mem. Op. 8.) The Court resolved that question by finding that Plaintiff McAndrew's statements were made in his capacity as a citizen. (McAndrew Mem. Op. 10-11.) Specifically, the Court found that although this area of the law did not "lend itself to bright line rules," Third Circuit precedent held that government employee speech before a grand

---

[10] As will be explained, whether an employee speaks in his citizen or employee capacity is dispositive of the question of First Amendment protection.

jury was presumptively citizen speech. (McAndrew Mem. Op. 8, 10.) Additionally, the Court found that "based on the limited information" available at the time, "the reporting of corruption and wrongdoing does not appear to fall within the ambit of the responsibilities of a deputy sheriff." (McAndrew Mem. Op. 11.) Accordingly, the Court found that McAndrew stated a "plausible First Claim for which relief can be granted, one which discovery may further substantiate." (McAndrew Mem. Op. 11.)

The Court also found that Plaintiff McAndrew's Pennsylvania Whistleblower Law claim survived. In so deciding, the Court noted that its review was limited to the issue of causation. (McAndrew Mem. Op. 16n.5) Assuming the veracity of the allegations contained in the Complaint (as it was bound to do), the Court concluded that "the complaint, when viewed as a whole, contains sufficient allegations to nudge plaintiff's PWL claim 'across the line from conceivable to plausible.'" (McAndrew Mem. Op. 20) (quoting Ashcroft v. Iqbal, 556 U.S. 662 (2009).) The Court did not, however, assess whether the substance of McAndrew's allegations qualified for Whistleblower Law protection.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), a court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine [dispute] as to any material fact and that the moving party is entitled to a summary judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); FED. R. CIV. P. 56(a). "If the moving party meets its burden, the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." Santini v. Fuentes, 795 F.3d 410, 416 (3d Cir. 2015) (internal citations and quotation marks omitted).  Therefore, in order to defeat a motion for summary judgment, the non-movant must establish that the disputes are both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law; and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.  "At the summary judgment stage of proceedings, courts do not 'weigh the evidence or make credibility determinations,' but, instead,

leave that task to the fact-finder at a later trial if the court denies summary judgment." Halsey v. Pfeiffer, 750 F.3d 273 (3d Cir. 2014) (quoting Petruzzi's IGA Supermarkets v. Darling-Delaware Co., 998 F.2d 1224, 1230 (3d Cir. 1993)).

## DISCUSSION

The Court's consideration of the Motion for Summary Judgment will begin with the First Amendment retaliation claim, and conclude with the Pennsylvania Whistleblower Law claim.

### I.    McAndrew's First Amendment Claim Survives Only To The Extent He Relies On His Testimony Before The Browndorf Grand Jury.

In order to evaluate a First Amendment retaliation claim, the Court employs a three-part burden shifting test. Initially, a plaintiff must show that the alleged activity was protected by the First Amendment and that the activity was a "substantial factor" in the alleged retaliatory action. Gorum v. Sessoms, 561 F.3d 179, 184 (3d Cir. 2009) (internal citations omitted). The burden then shifts to the defendant to demonstrate that it would have taken the same action, even if the protected conduct had not taken place. Id.

#### A.    Most, But Not All, of Plaintiff McAndrew's Challenged Speech is Outside the Scope of First Amendment Protection.

In order to show that the First Amendment protected his speech, a public employee must demonstrate three things: (1) that the speech was made in the employee's capacity as a citizen, and not as an employee; (2) the statement involved a matter of "public concern;" and, (3) the government did not possess "an adequate justification for treating the employee differently from any other member of the general public as a result of the statement made under the Pickering balancing test." Dougherty v. School Dist. of Phila., 772 F.3d 979, 987 (3d Cir. 2014).

The Court finds that Defendants are entitled to summary judgment on three of the four instances of challenged speech. The Court holds that McAndrew's speech before the Browndorf Grievance Hearing was unprotected employee speech, and that there exists no genuine issue of material fact with respect to the existence of his expressive conduct concerning the Sergeant White issue, firearms complaints, and the use of force issue. Accordingly, the Court will grant summary judgment for Defendant on those instances of speech. However, the Court finds that Plaintiff McAndrew's testimony before the Browndorf Grand Jury is protected.

### i. Plaintiff McAndrew's Testimony At The Browndorf Grievance Hearing Was Unprotected Employee Speech

In order to qualify for First Amendment protection, a public employee must be speaking in his capacity as a citizen, and not as a government employee. Garcetti v. Ceballos, 547 U.S. 410, 421 (2006). The "critical question" when categorizing the capacity of the speaker is whether the speech "itself is ordinarily within the scope of an employee's duties, and not whether it merely concerns those duties." Lane v. Franks, __ U.S. __, 134 S.Ct. 2369, 2379 (2014); see also Flora v. Cnty. of Luzerne, 776 F.3d 169, 176-77 (3d Cir. 2015) ("The controlling factor is whether the statements were made pursuant to the speaking employee's duty, that is whether such utterances were among the things that the employee was employed to do.").  The Supreme Court has emphasized that speech by a public employee is still protected by the First Amendment even if it "concerns information acquired by virtue of his public employment." Lane, 134 S.Ct. at 2379; see also Dougherty v. School Dist. of Phila., 772 F.3d 979, 990 (3d Cir. 2014) ("Lane reinforces Garcetti's holding that a public employee may speak as a citizen if his speech involves the subject matter of his employment.").

This inquiry into job duties and speech is a "practical one." Dougherty, 772 F.3d at 988 (quoting Garcetti, 547 U.S. at 424). Whether a particular incident of speech was made pursuant to a public employee's job duty (and thus not protected) entails questions of both law and fact. Foraker v. Chaffinch, 501 F.3d 231, 240 (3d Cir. 2007) abrogated on other grounds by Borough of Duryea v. Guarneri, 564 U.S. 379 (2011). "Specifically, the scope and content of a plaintiff's job responsibilities is a question of fact, but the ultimate constitutional significance of those facts is a question of law." Flora v. Cnty. of Luzerne, 776 F.3d 169, 175 (3d Cir. 2015) (internal quotations omitted).  Keeping in mind its obligations under Federal Rule of Civil Procedure 56(a) and the binding authority interpreting that rule, the Court now turns to the precise question before it: (1) whether there exist any genuine questions of material fact concerning the "scope and content" of McAndrew's responsibilities as they relate to the instances of challenged speech; and, (2) the constitutional significance of those undisputed facts, if any exist.

There is no genuine dispute of material fact concerning the scope and content of McAndrew's responsibilities as they pertain to the Browndorf Disciplinary Hearing. Plaintiff McAndrew's deposition testimony makes clear that he believed he was working when he testified. (McAndrew Dep. 125:21-23.) When pressed, McAndrew explained that he and Plaintiff

Klein "were working in an official capacity. We were asked by the County to be there." (McAndrew Dep. 125:24-126:2.) Moreover, McAndrew's post-testimony conduct further buttresses this point: he spoke with Sergeant Browndorf, as well as the Sheriff's secretary—who handled the payroll—about compensation for his testimony. (McAndrew Dep. 125:11-22.) The Court also notes that McAndrew was actually paid for his testimony. (McAndrew Dep. 125:1-2.) The Court finds that, in light of the foregoing, there is no genuinely disputed material fact concerning McAndrew's responsibilities: McAndrew clearly believed he was testifying in an official capacity.

There being no dispute that McAndrew believed that he was "on the clock," the Court now turns to the constitutional significance of that fact. The Court finds that its decision is controlled by Garcetti v. Ceballos, 547 U.S. 410 (2006). In Garcetti, the Supreme Court considered whether an assistant district attorney spoke in his capacity as a citizen or employee when he authored a memorandum recommending that a pending prosecution be dismissed. Id. Ultimately, the Supreme Court determined that the plaintiff's spoke as an employee, and not a private citizen. Id. at 422. The Court explained that when the plaintiff "went about conducting his daily professional activities," he did not act as a citizen. Id. The Court found that "when [the plaintiff] went to work and performed the tasks he was paid to perform, [the plaintiff] acted as a government employee." Id.

Like the plaintiff in Garcetti, Plaintiff McAndrew asks the Court to extend First Amendment protection to speech made in the course of work he was paid to perform. For the reasons laid out in Garcetti, the Court declines McAndrew's invitation. Put simply, the clear and undisputed facts demonstrate Plaintiff McAndrew strongly held belief that he was working when he testified at the Browndorf Hearing. He stated as much during his deposition. (McAndrew Dep. 125:21-23.) The Court takes Plaintiff McAndrew at his word, and in the absence of any authority that would compel the opposite result, finds that his speech at the Disciplinary Hearing was made in his capacity as an employee, and not a private citizen. Therefore, that speech is not protected by the First Amendment and cannot serve as the basis for a First Amendment retaliation claim.

The Court also points out that it would reach the same conclusion even under Lane v. Franks, 134 S.Ct. 2369 (2014). In Lane, the Supreme Court considered whether an employee's testimony, compelled by a subpoena, was outside the scope of his ordinary job responsibilities.

Lane, 134 S.Ct. 2369 at 2378. Before determining that such speech was citizen speech, the Court clarified that "the critical question under Garcetti is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." Id. The Third Circuit has declined on several occasions to determine the precise impact of Lane on Garcetti. See Flora v. Cnty. of Luzerene, 776 F.3d 169, 179 (3d Cir. 2015); Dougherty v. School Dist. of Phila., 772 F.3d 979, 990 (3d Cir. 2014). However, this Court finds that even assuming that Lane narrowed Garcetti, Plaintiff McAndrew's speech would still not be considered citizen speech.  McAndrew's own words make clear that he believed he was working during the hearing.

### ii.   Plaintiff Has Failed To Create A Genuine Issue of Material Fact With Respect to the Sergeant White Complaint

In his Complaint, Plaintiff McAndrew alleged that he was retaliated against after he informed Sergeant White that he intended to file a human resources complaint against Defendant Waltman. (Compl. ¶ 25.) Defendants contend that Plaintiff McAndrew cannot offer this speech as the basis for his First Amendment claim because it never actually happened. (MSJ 24). As evidence, they point to an email sent from Plaintiff *Klein* to Sergeant White, where Plaintiff *Klein* notifies Sergeant White that the "delta units," including McAndrew, "are submitting a formal complaint against certain members of our administration." (MSJ 24) (quoting MSJ Ex. X 1). For the reasons that follow, the Court will grant summary judgment in favor of Defendants.

Klein appears to have spoken on McAndrew's behalf, and McAndrew claims to have been retaliated against for that speech. (McAndrew Compl. ¶ 25; MSJ Ex. X 1). Thus, the Court confronts the question of whether a plaintiff can sustain a First Amendment retaliation claim where a third-party speaks on the plaintiff's behalf. The first requirement to succeed on a First Amendment retaliation claim is demonstrating that the employee "spoke on a matter of public concern." Forgarty v. Boles, 121 F.3d 886, 888 (3d Cir. 1997). But Plaintiff McAndrew has failed to demonstrate that he "spoke" either through words of other expressive conduct. Plaintiff McAndrew's Response to Defendants' Motion for Summary Judgment offers no evidence supporting the existence of such speech or conduct; in fact, it offers *no evidence or legal argument at all* on this point. Properly argued, he may have prevailed—presuming that he could point to evidence that he did speak in some manner and that Sergeant White understood the message as coming from McAndrew. However, that is not the case here. There being a total

failure of evidence or argument on this point, the Court finds that Plaintiff McAndrew has failed to carry his burden. Accordingly, the Court will grant summary judgment in Defendants' favor to the extent that McAndrew's claim relies on his purported speech to Sergeant White.

### iii.   Plaintiff Has Failed to Create A Genuine Issue of Material Fact With Respect to The Firearms Complaints.

In their Motion for Summary Judgment, Defendants assert that they are entitled to summary judgment with respect to the firearms certification complaint because "Plaintiff fails to show that he had any meaningful involvement in the complaints." (MSJ 22.) Defendants argue that "Plaintiff admits that he did not have any first-hand knowledge of the firearms certification issues, and his knowledge of Lt. French's lack of a proper firearms certification and Groman's alleged false certification of deputies was based solely on what Klein and Prudish told him." (MSJ 22.) The Plaintiff's Joint Response is silent about his involvement with these complaints. (Pls.' Joint Resp. 8)  Rather, it focuses entirely on *Plaintiff Klein*'s speech. (Pls.' Joint Resp. 8) ("Klein's Complaints Regarding Improper Weapons Certifications and Lack of Weapons Maintenance Qualified as Protected Speech.").

In accord with the Court's decision concerning the Sergeant White complaint, the Court finds that Plaintiff McAndrew has failed to meet his burden of demonstrating speech or conduct with respect to the firearms complaint. Several of McAndrew's deposition statements make clear that it was *Plaintiff Klein* who made this complaint. (See McAndrew Dep. 96:11-19 ("When I met with Dave Rouland it was Bill Klein, myself and Dave Rouland. Bill basically made [the firearms certification] complaint to him and I would backup his statements, things that I heard and things that I saw. Bill did the majority of the talking about the firearms."); see also McAndrew Dep. 105:8-12) ("Q.: When you met with Rouland did you tell him about the firearms issue or did Klein tell him about the firearms issue? A.: Klein. I believe Klein did. He handled all that stuff."). This conclusion is buttressed further by Plaintiffs' Brief in Opposition to Summary Judgment, which refers to this issue as "Klein's Complaints" and focuses almost exclusively on Klein's conduct. (Pls. Resp. 8-9.)  Because Plaintiff McAndrew has failed to offer evidence of his own expressive conduct with respect to the fire arms complaint, the Court finds that no reasonable jury could find that he engaged in conduct protected by the First Amendment. Accordingly, the Court will grant summary judgment in favor of Defendants.

### iv.   McAndrew's Testimony Before the Browndorf Grand Jury Is Protected By The First Amendment

Having determined that summary judgment is appropriate as to any claim flowing from the aforementioned instances of McAndrew's putative speech, the Court now turns its attention to his speech before the Browndorf Grand Jury. The parties do not dispute that McAndrew's Grand Jury speech satisfies the first two elements of the First Amendment test: that McAndrew (1) spoke as a citizen (2) on a matter of public concern. Accordingly, the Court will only address whether McAndrew's Grand Jury testimony satisfies the third prong of the First Amendment test: whether the plaintiff's interest in his speech is outweighed by the government's interest as an employer. See Dougherty v. School Dist. of Phila, 772 F.3d 979, 987 (3d Cir. 2014).

Defendants' argument in favor of summary judgment against Plaintiff McAndrew largely tracks the one they offer against Plaintiff Klein. Specifically, Defendants assert that the "State's interest in disciplining law enforcement officers who take an oath to uphold the law for failing to report misconduct of others outweighs Plaintiff McAndrew's interest in testifying before the Browndorf Grand Jury." (MSJ 27-28.)   More specifically, Defendants assert that Plaintiff's failure to report Browndorf's assault and the false arrests of Romanek and Doneker "violate[d] the trust of the public he [was] responsible for protecting and compromises the integrity of [the] Sheriff's Department." (MSJ 27) (quoting Defs.' Ex. B. to MSJ at 45). Defendants also assert that McAndrew, by virtue of his position as a law enforcement officer, should be held to a "high standard of conduct," although it is unclear how exactly this would impact the Court's analysis. (MSJ 28.)

By way of response, Plaintiff McAndrew (and Klein) asserts that Defendants "mischaracterize" the subject of the protected speech, as well as the "true reason" for Klein's termination. (Pls.' Resp. 7.) In his view, the Court should consider whether "Defendants' interest in promoting efficiency of public services of the Sheriff's department, somehow outweighs Plaintiffs' interest in testifying about the department lacking use of force policies and procedures." (Pls.' Resp. 7.) Finally, Plaintiff McAndrew asserts that this question is one of fact that is more appropriately resolved by a jury. (Pls.' Resp. 7.)

### 1.   Standard

The third prong of the First Amendment test requires a court to apply "the balancing test derived from Pickering v. Bd. of Educ., 391 U.S. 563 (1968), to determine whether an employee's interest in the speech outweighs the state's countervailing interest as an employer in

promoting workplace efficiency and avoiding workplace disruption." Spring v. Henry, 435 F.3d 268, 275 (3d Cir. 2006) (internal quotations omitted). "The inquiry involves a sliding scale, in which the amount of disruption a public employer has to tolerate is directly proportional to the importance of the disputed speech to the public." Munroe v. Central Bucks Sch. Dist., 805 F.3d 454, 472 (3d Cir. 2015) (internal quotations omitted).

The "fact-intensive" balancing of interests "requires consideration of the entire record, and must yield different results depending on the relative strengths of the issues of public concern and the employer's interest." Miller v. Clinton Cnty., 544 F.3d 542, 548 (3d Cir. 2008); see also Reilly v. City of Atlantic City, 532 F.3d 216, 232 (3d Cir. 2008) ("Where a plaintiff claims that the stated grounds for his/her discipline were a pretext for the discipline imposed ... the court considers all of the speech that the plaintiff alleges is protected."). "On the employee's side of the scale, [the court] must consider the interests of both [the plaintiff] and the public in the speech at issue." Munroe, 805 F.3d at 472 (internal citations and quotations omitted). Although the facts surrounding a particular incident of speech shape the Pickering inquiry, courts will often consider the extent to which the speech at issue "has a detrimental impact on close working relationships requiring personal loyalty and confidence, impedes the performance of the speaker's duties, or interferes with the enterprises regular operations." Id.

### 2.  Application

The Court finds that the balance of interest weighs in favor of Plaintiff McAndrew. In reaching this decision, the Court notes that Reilly v. City of Atlantic City is particularly instructive. 532 F.3d 216.  In that case, the Third Circuit considered whether the plaintiff's interest in speaking out about police corruption outweighed the defendants' interest in an efficient police department.  Id. at 232.

In the late 1980s and early 1990s, Reilly worked in the vice and intelligence units of the Atlantic City Police Department. Id. at 220.  In that capacity, he participated in and testified at the corruption trial of Atlantic City Police Officer Dennis Munoz, a personal friend of Officer Robert Flipping. Id. During that time, Reilly also investigated Flipping, who would later become Atlantic City Director of Public Safety, and individuals close to Flipping. Id. Reilly also alleged that he made enemies with an Officer Arthur Snellbaker by virtue of Reilly's close association with then police chief, James DiNoto. Id. Snellbaker would later become the Chief of the Atlantic City Police Department. Id.

In 2000, Reilly was accused of creating a hostile work environment, lying to internal affairs, and improperly contacting witnesses. Id. at 221. In 2003, after arbitration by a neutral third-party, Flipping threatened to discipline Reilly by removing him from the promotion list, suspending him for ninety days, and demoting him from sergeant to patrolman. Id. at 221-22. Ultimately, Flipping suspended that discipline, and instead permitted Reilly to retire, provided he do so immediately. Id.  Reilly retired, and brought suit alleging a violation of his First Amendment rights. Id.  Reilly's suit alleged that Flipping and Snellbaker used the complaint in 2000 as a vehicle by which to retaliate against him for his speech in the Dennis Munoz matter. Id.at 219. Before the Third Circuit, Snellbaker argued that Reilly was not entitled to First Amendment protection for his speech in the Munoz matter because his right to speak was outweighed by the police department's interest in disciplining Reilly for creating a hostile work environment. Id. at 232.

The Third Circuit rejected Snellbaker's argument. Id. In so doing, the Third Circuit noted that "where a plaintiff claims that the stated grounds for his/her discipline were a pretext for discipline imposed, the court does not apply the Pickering balancing test solely to the speech that defendants claim motivated the disciplinary action." Id.  Rather, the court must apply Pickering balancing test to *both* the speech cited by the defendants as cause for discipline, and speech cited by the plaintiff as the cause for discipline. Id. So, the Third Circuit reasoned, the district court properly held that the public's interest in hearing testimony about police corruption outweighed the defendants' interest in maintaining order by disciplining Reilly. Id.

Finally, the Third Circuit noted that: "to the extent that Snellbaker attempts to argue that his disciplinary recommendation was justified by Reilly's violations and was in no way connected to Reilly's speech in the Munoz matter, his argument *is more properly viewed as a challenge to the factual issues of motivation and rebuttal*." Id. at 232-33. In other words, the fact that defendants cited an alternate incident of speech as their reason for terminating the plaintiff was more appropriately viewed in the context of the second and third elements of a First Amendment retaliation claim—causation and the same decision defense, and not in the first element's Pickering analysis. See Id.

The Court finds that the reasoning in Reilly guides its decision in the case at bar. Here, Defendants assert that Plaintiff's and the public's interest in McAndrew's testimony must yield to Defendants' interest in discharging a deputy sheriff for failing to report a crime against a

citizen. (MSJ 25.)  This argument parallels the one rejected by the Third Circuit in <u>Reilly</u>. Here, Defendants argue that Plaintiff McAndrew's admissions during the Grand Jury concerning the July 26, 2011, incident provide an independent basis for his termination. Accordingly, they frame the balance between "the state's interest in discharging a deputy sheriff for failing to report a crime against a citizen" and the "Plaintiff's interest in the speech." (MSJ 26.)  Like the defendants in <u>Reilly</u>, Defendants here have too narrowly constructed the balance to be made. Instead, the question is whether Plaintiff's and the public's interest in exposing police malfeasance outweighs Defendants' interest in a functional Sheriff's Department. That an independent basis for terminating McAndrew may exist in McAndrew's Grand Jury testimony goes to both causation and the same decision defense, not whether the speech is entitled to First Amendment protection. <u>See</u> <u>Reilly</u>, 532 F.3d at 232-33. Accordingly, the Court rejects Defendants' argument that McAndrew's speech before the Grand Jury was not protected by the First Amendment and will not grant summary judgment on this basis.

### B.   McAndrew Has Offered Sufficient Evidence Showing That His Grand Jury Speech Was A "Substantial Factor" In His Termination To Create A Genuine Issue of Material Fact

Mindful of its obligation to refrain from weighing the evidence at the summary judgment stage, <u>Montone v. City of Jersey City</u>, 709 F.3d 181, 191 (3d Cir. 2012), the Court now turns to the first question of fact: whether Plaintiff McAndrew has provided evidence that his speech was a "substantial factor" in his termination. <u>Gorum v. Sessoms</u>, 561 F.3d 179, 184 (3d Cir. 2009).

Third Circuit precedent provides three pathways for a plaintiff to demonstrate causation in a First Amendment retaliation case. <u>Lauren W. ex rel. Jean W. v. DeFlaminis</u>, 480 F.3d 259, 267 (3d Cir. 2007). The plaintiff satisfies his burden by demonstrating (1) an "unusually suggestive temporal proximity" between the speech and the allegedly retaliatory conduct; (2) a "pattern of antagonism coupled with timing;" or, (3), that the "record as a whole" permits a trier of fact to infer causation. <u>Id.</u>  The Court also notes that the Third Circuit requires that the decision makers be aware of the protected speech. <u>Ambrose v. Twp. of Robinson</u>, 303 F.3d 488, 493 (3d Cir. 2002) ("It is only intuitive that for protected conduct to be a substantial or motivating factor in a decision, the decision makers must be aware of the protected conduct.").

**i. Plaintiff McAndrew Has Proffered Sufficient Evidence That His Speech Before The Browndorf Grand Jury Was A "Substantial Factor" In His Termination.**

The Court finds that, even minding its obligation of intense scrutiny, Lauren W., 480 F.3d at 268, Plaintiff McAndrew has offered sufficient evidence to create a genuine issue of material fact as it pertains to the antagonism and timing test in the context of McAndrew's grand jury speech. In all other respects, the Court finds that Plaintiffs have failed to meet their burden to survive summary judgment.

Again, the Court turns to the Third Circuit's decision in Reilly v. City of Atlantic City, 532 F.3d 216, 233 (3d Cir. 2008), as the controlling authority. Aside from his arguments concerning the extent of First Amendment protection (see Discussion Part I.A.iv), a defendant in Reilly argued that the district court committed reversible error by leaving the causation question fo the jury. Reilly, 532 F.3d at 233. He argued that the length of time between Reilly's speech and the adverse employment action—approximately ten years—foreclosed any possible First Amendment violation. Id. The Third Circuit rejected the defendant's argument and upheld the district court's decision to submit the issue of causation to the jury. Id. In the Court's view, the district court properly denied judgment as a matter of law because the plaintiff showed a temporal connection *and* other facts that gave rise to the inference of retaliation. Id. These other facts related to the defendant's knowledge of the plaintiff's conduct, the defendant's feelings about that conduct, and the defendants own role in the termination. Id. In the Third Circuit's view, such facts "were sufficient to establish a *prima facie* case." Id.

The Court finds that, similar to Reilly, summary judgment is inappropriate because a reasonable trier of fact could infer causation based on the existence of a pattern of antagonism and a temporal link between the protected speech and the termination. As an initial matter, McAndrew has produced evidence from which a reasonable jury could find the existence of a pattern of antagonism. McAndrew vociferously complained about perceived departmental malfeasance as early as 2010, which correlated temporally with a number of perceived retaliatory actions. (See Statement of Facts Part I, III.) A finder of fact could determine that the myriad of inconveniences suffered by McAndrew during the same period as his complaints raises the inference of a pattern of antagonism.

However, a pattern of antagonism does not, by itself, create a triable issue of fact. The Court also finds that Plaintiff McAndrew has also proffered sufficient evidence of a temporal link between the protected speech and his termination—the second element of the antagonism and time test. McAndrew spoke before the Browndorf Grand Jury on September 22, 2011. (Ex. Q 1.) Even though it is unclear from the record when McAndrew's testimony was unsealed, Chief Shook's report on the July 25, 2011 incident indicates that Shook interviewed McAndrew on February 10, 2012. (Ex. O 3.) This report—which recommended that McAndrew be terminated—was issued on February 13, 2012, and by February 21, 2012 Plaintiff McAndrew received official notice of his termination from the County's Human Resources Department. (Ex. U 7.) Even calculating the longest possible timespan—between the actual speech at the Grand Jury and his termination the following February, the amount of time would only be 152 days. However, the timespan is probably shorter, considering the Grand Jury testimony would to have been unsealed until sometime later. In either case, Plaintiff McAndrew's alleged link is far shorter than the ten years considered sufficient by the Third Circuit in Reilly. See also, McNeilly v. City of Pittsburgh, 40 Supp.3d 643, 655 (W.D.Pa. 2014) (denying a motion to dismiss for failure to state a claim where the plaintiff was terminated approximately six years after the allegedly protected speech). Accordingly, the Court finds that Plaintiff McAndrew has proffered sufficient evidence of a temporal link, and has therefore made the requisite showings under the antagonism and time test to create a triable issue of fact.

As a final note, the Court rejects Defendants argument that Plaintiff McAndrew is unable to prove causation because he has pointed to no evidence that Defendants were aware of his testimony before the Grand Jury. (MSJ 29.)  Defendants concede that Chief Shook relied on summaries of Plaintiff's testimony before the Browndorf Grand Jury, and not the actual testimony transcript, in authoring the report that led to Plaintiff's termination. (Defs.' Resp. to CSOF ¶ 146.) That summary states that,

> According to Deputy McAndrew, he did not write an incident report on this case, and it was typical that reports were not completed by sheriffs working on the warrant teams unless they were directed to do so by their supervisor. Neither supervisor, Corporal Prudish or Sgt. Browndorf, had asked him to write a report of this incident. Deputy McAndrew did not believe that anyone had prepared an incident report for this incident.

(Pls.' Resp. Ex. S 25-26.)  Based on his deposition testimony, a reasonable jury could infer that Defendant Donnelly relied on the Shook report, which relied on the Grand Jury testimony. (Donnelly Dep. 96:22-97:2; 97:12-15, 22-24; 98:15-20.) Therefore, the Court rejects Defendants' argument that Defendant Donnelly was unaware of the protected speech.

### ii. Plaintiff McAndrew Has Failed to Show the Existence of A Genuine Dispute of Material Fact With Respect to the Corruption and Vehicle Complaints

For purposes of causation analysis, the Court assumes, without deciding, that Plaintiff McAndrew's corruption and vehicle safety complaints were protected by the First Amendment.[11] Unfortunately for Mr. McAndrew, the Court finds Plaintiff has failed to create genuine issue of material fact that these instances of the speech were a "substantial factor" in his termination, and thus Defendants are entitled to summary judgment.

In order to show that a given incident of speech was a "substantial factor" in his termination, a plaintiff must show that the decision maker was aware of the speech at issue. Ambrose v. Twp. of Robinson, 303 F.3d 488, 493 (3d Cir. 2002) ("It is only intuitive that for protected conduct to be a substantial or motivating factor in a decision, the decisionmakers must be aware of the protected conduct."). In this case, the parties acknowledge that Defendant Donnelly was responsible for the decision to terminate Plaintiff McAndrew. (DSUF ¶ 99; Pls.' Resp. to DSFU ¶ 99.) So, properly framed, the Court must determine whether Plaintiff McAndrew has offered sufficient evidence to show that Defendant Donnelly had knowledge of his corruption and vehicle safety complaints.

The Court finds that Plaintiff McAndrew has failed to make the requisite showing, and will therefore grant summary judgment in Defendants' favor. The record indicates that Plaintiff

---

[11] The parties reference a greater universe of speech than they actually attempt to defend in their briefs. Defendants assert that the First Amendment does not protect McAndrew's complaints concerning the lack of use of force policies and procedures. (MSJ 22.) However, Defendants never provide any argument concerning how or why this is the case, and even if they had, the Court finds that the Grand Jury speech—which contained the use of force policy complaint—to have been protected by the First Amendment. (See MSJ 22.) Plaintiff McAndrew claims that his complaints to Commissioner Marseglia concerning the Department's lack of policies and procedures, his complaints concerning vehicle safety, and complaints concerning corruption, all constitute protected speech. (Pls.' Resp. 9.) Presumably, this list of bald assertions is intended to persuade the Court that these statements should survive summary judgment as bases for the alleged retaliation. The Court may never know, because Plaintiff McAndrew failed to provide any explanation beyond his list. Heeding its obligation to approach the motion in a light most favorable to Plaintiff McAndrew, the Court assumes—without deciding—that First Amendment protection extends to this speech. Defendants are, nonetheless, entitled to summary judgment because Plaintiff McAndrew has failed to create a genuine factual dispute with respect to causation.

made the corruption and vehicle safety complaints to Defendant Marseglia. (See Statement of Facts Part II.D (discussing the various corruption complaints and how those complaints were made by Plaintiff McAndrew and co-Plaintiff Klein); Statement of Facts Part II.C (discussing the poor vehicle maintenance complaints).) [12] However, Plaintiff McAndrew has not pointed the Court to any evidence that Defendant Donnelly was aware of those complaints before terminating Plaintiff. In line of its obligation under Ambrose, the Court will grant summary judgment in Defendants' favor.

### C.  A Genuine Issue of Material Fact Exists As To Whether Plaintiff McAndrew Would Have Been Terminated Absent His Protected Speech

The court now turns to the second question of fact presented by Defendants' Motion for Summary Judgment: whether Plaintiff McAndrew would have been terminated absent his protected speech. At the outset, the Court notes that both parties have cited to case law describing retaliation under Title VII, and various other pieces of civil rights legislation. (See, MSJ 34-35; Pls.' Resp. 16.) Although not controlling in this matter, the Court finds that these analogies are appropriate. See Ambrose v. Twp. of Robinson, 303 F.3d 488, 494 (3d Cir. 2002) (noting at least one occasion where the Third Circuit has imported Title VII concepts into First Amendment retaliation analysis).

Defendants present two rationales for granting their Motion for Summary Judgment on this point. First, Defendants argue that McAndrew has failed to offer "any facts to suggest that plaintiff's termination for his failure to report Browndorf's crimes was pretextual." (MSJ 34.) In their view, McAndrew's offered evidence amounts to "baseless speculation" that he was fired for any other reason than his failure to report the July 26, 2011 incident. (MSJ 34.) Second, Defendants argue that Plaintiffs have offered no proper comparators that would help establish that Defendants' justification for termination was pretextual. (MSJ 34-35.)

Plaintiff attempts to cast doubt upon Defendants' same decision defense in three different ways. As an initial matter, Plaintiff McAndrew asserts that Sheriff Donnelly, as the only person with authority and ability to terminate McAndrew, "testified to wildly varying reasons for the termination, some of which are untrue, and others that make little sense." (Pls.' Resp. 17.) Next,

---

[12] The "corruption complaints" consist of four components, which include (1) spying on coworkers, (2) receiving compensation for walking in parades and handing out campaign material for Sheriff Donnelly, (3) ordering deputies to assemble and post political signs supporting Donnelly's reelection, and (4) rigging vehicle maintenance bids. (See Statement of Facts Part I.D.)

Plaintiffs attack the Shook report. (Pls.' Resp. 21.) And finally, Plaintiff McAndrew asserts the existence of several comparators, which further undermine Defendants' same decision defense.

### i. Standard

If a plaintiff demonstrates that the First Amendment protects his speech and that the protected speech was a substantial factor in the alleged retaliation, the burden shifts to the defendant to prove the same decision defense. See Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 285-86 (1977) ("The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct."); see also Suppan v. Dadonna, 203 F..3d 228, 236 (3d Cir. 1999) ("[T]he defendants, in proving 'same decision,' must prove that the protected conduct was *not* the but-for cause.") (emphasis in original). A defendant accomplishes this by "demonstrating by a preponderance of the evidence that the same action would have been taken even in the absence of protected conduct." Watters v. City of Phila., 55 F.3d 886, 892 (3d Cir. 1995). "While but-for causation is the ultimate question, it is the defendants' burden to prove lack of but-for causation." Suppan, 203 F.3d at 236.

For his part, a plaintiff may avoid summary judgment "by offering evidence that discredits the reasons articulated by the defense for the adverse employment action." Montone v. City of Jersey City, 709 F.3d 181, 191 (3d Cir. 2013). A plaintiff accomplishes this by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons such that a reasonable factfinder could find them unworthy of credence." Simpson v. Kay Jewelers., 142 F.3d 639, 644 (3d Cir. 1998). In so doing, a plaintiff need not produce evidence that "necessarily leads to the conclusion that the employer acted for discriminatory reasons, nor produce additional evidence beyond her *prima facie* case." Id. (internal citations omitted).

### ii. Application

Although this issue presents a closer question, the Court finds that summary judgment on this issue would be inappropriate. The Court reaches this conclusion for two reasons. First, the Court finds that accepting Defendants' rationale at this point would require the Court to inappropriately judge credibility. And second, the Court concludes that sufficient comparator evidence exists to create a genuine question of material fact concerning the same-decision defense.

1.   **The Court Will Not Make Credibility Determinations at the Summary Judgment Stage**

As a general matter, Defendants ask the Court to find a total failure of the Plaintiff's evidence on the same decision defense. In essence, Defendants ask the Court to credit their proffered rationale for McAndrew's termination: failing to report Browndorf's conduct during the July 26, 2011 incident. Ratifying this stated reason would require the Court to inappropriately engage in the weighing of evidence. See Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989) ("[C]redibility determinations, the weighing of the evidence and the drawing of legitimate inferences from the facts are jury functions, not those of the judge.")

The Court finds that the language of McAndrew's termination letter and Donnelly's subsequent explanations create a genuine question of fact that the Court would have to adjudicate were it to grant this Motion. The termination letter claims that McAndrew violated his oath of office by submitting false records (Ex. U 7.) Specifically, the letter explains that "to submit falsified documents as official factual reports of incidents, and then fail to testify as to submitting them is in violation of this sworn oath." (Ex. U 7.) The letter concludes by stating that McAndrew's conduct "shows dishonesty and a sever [sic] lack of credibility that is needed to be a law enforcement officer." (Ex. U 5.) When asked why this was included in McAndrew's termination letter, Sheriff Donnelly explained that he thought that Plaintiff McAndrew had testified falsely to County detectives who were investigating Browndorf. (Donnelly Dep. 251:6-252:3.) However, Donnelly conceded that he never reviewed the testimony that Klein or McAndrew provided. (Donnelly Dep. 251:4-6) ("Q: Did you review the testimony that [Klein and McAndrew] gave to the County detectives? A: No.") Moreover, Donnelly admitted that he was not "aware of" any written documents produced by Klein or McAndrew. (Donnelly Dep. 251: 7-9.)  Based on the foregoing, the Court finds that a reasonable jury could conclude that Donnelly's admittedly unverified conclusions render the proffered reason for McAndrew's termination "unworthy of credence." Simpson, 142 F.3d at 644 (3d Cir. 1998).

2.   **Comparator Evidence Creates a Genuine Issue of Material Fact Concerning the Same Decision Defense**

In addition, the Court finds that sufficient comparator evidence exists for a reasonable jury to conclude that Defendants' reason for termination was pretextual. In the Title VII context to which we analogize here, a similarly situated employee "does not need to be identically

situated, but the comparator must be similar to plaintiff in all relevant respects." Abdul-Latif v. Cnty. of Lancaster, 990 F.Supp.2d 517, 526 (E.D. Pa. 2014); see also Doe v. Apria Healthcare Group, Inc., 97 F.Supp.3d 638, 645 (E.D.Pa. 2015). When assessing a comparator, "[c]ontext matters." McCullers v. Napolitano, 427 Fed.Appx. 190, 195 (3d Cir. 2011). Accordingly, a court should consider whether "the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct." Id.[13]

In their Memorandum of Law, Defendants assert that Plaintiff McAndrew "cannot point to a single other employee who witnessed a crime against a citizen by an employee of the Sheriff's Department, knew that the citizen was wrongfully charged with a felony and incarcerated, and failed to take any action to report the crime." (MSJ 35.) The Court rejects this construction of the comparator inquiry. Defendant's first clause improperly relies on the assumption that Plaintiffs Klein and McAndrew witnessed Browndorf commit a crime— something that was only determined with any certainty much later. The second clause is irrelevant –that Klein and McAndrew may have attended some of Romanek and Doneker's respective criminal proceedings and learned of their circumstances simply does not help the Court determine whether the proffered comparators are actually valid comparisons.

Having rejected Defendants' overly narrow construction, the Court finds that "relevant respects" for comparison in this case encompass: (1) whether a deputy was present at the execution of the warrant for Philip Romanek's arrest on July 26, 2011; (2) whether the deputy was under the command of Sergeant Browndorf at the incident; and (3), whether the deputy issued an accurate report of the events at the Romanek arrest. These three factors properly account for the full context of the circumstances of before the Court, and our sister courts' interpretation of the law on this issue. See Doe v. Apria Healthcare Group, Inc., 97 F.Supp.3d 638, 645 (E.D.Pa. 2015); Abdul-Latif v. Cnty. of Lancaster, 990 F.Supp.2d 517, 526 (E.D. Pa. 2014).

Under the Court's construction of the inquiry, Deputy Boyle and Corporal Prudish provide sufficient comparators. Like Plaintiff McAndrew, Boyle participated in the execution of the warrant (having been the Deputy to lower Romanek from Doneker's attic to Browndorf, Klein, and McAndrew below), acted under the command of Sergeant Browndorf at the incident,

---

[13] The Court notes that its articulation of the rule on this issue relies on the opinions of a co-equal court, and at least one non-precedential opinion from the Third Circuit. Although under no obligation to apply the standards enunciated by either source, nonetheless, the Court chooses to do so in the interest of judicial comity.

and did not author a report in the wake of the warrant service. (Statement of Facts Part II.A.) Similarly, Corporal Prudish was present at Doneker's house during the warrant execution, served as Browndorf's second in command, and failed to author *an accurate* report of the events on July 21. (Statement of Facts Part II.A; Statement of Facts Part II.D.) Accordingly, the Court finds that both present valid comparisons to Plaintiff McAndrew.

Additionally, the Court concludes that the treatment of Boyle and Prudish casts sufficient doubt upon Defendants' proffered reason for terminating Plaintiff McAndrew so as to create a genuine issue for trial. Boyle continued to work for the Sheriff's Department, despite the similarity between his conduct and Plaintiff McAndrew's conduct. Although the question is closer, [14] the Court finds that, in light of the procedural posture of the case, Prudish's treatment would also permit a reasonable jury to determine that the Sheriff's explanation for terminating McAndrew was pretextual. See Somerset Consulting, LLC v. United Capital Lenders, LLC, 832 F.Supp.2d 474, 479 (E.D. Pa. 2011) ("In evaluating a Rule 56 motion, we must draw all reasonable inferences in favor of the nonmoving party.") (internal quotation omitted).

In light of the foregoing, the Court denies summary judgment insofar as Plaintiff McAndrew brings a First Amendment claim based on his testimony before the Browndorf Grand Jury.

### D. Plaintiff Has Failed to Proffer Sufficient Evidence of Defendant Waltman's Personal Involvement in His Termination.

As this Court explained in Berrios v. City of Phila.,

> In a civil rights case brought pursuant to 42 U.S.C. § 1983, Plaintiff must show that Defendant, acting under the color of state law deprived him of "rights privileges, or immunities secured by the Constitution or the laws of the United States." Parratt v. Taylor, 451 U.S. 527, 535 (1981). An individual state actor is liable under section 1983 only where he or she played an "affirmative part" in the alleged misconduct. Mason v. City of Phila., 2014 WL 4722640, at *5 (E.D.Pa. 2014) (citing Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005)(internal citations omitted)). "A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*." Rode v. Dellarciprete, 845 F.2d 1195, 1207

---

[14] There exists some question about Prudish's treatment. Sheriff Donnelly conceded that he "agreed to allow Prudish to come back despite the fact that [he] knew that [Prudish] crated a false report and lied to a grand jury." (Donnelly Dep. 123:23-124:2.) When asked whether his decision to bring Prudish back was "voluntary," Donnelly responded, "Yes." (Donnelly Dep. 124:6-8.) In Defendants' Reply Brief, they state that Prudish returned to the Department only after settling a grievance. (Defs.' Reply 22 n.20.) This question about Prudish's treatment, however, further demonstrates the need for a jury determination.

(3d Cir. 1988) (citing <u>Parratt</u>, 451 U.S. at 537 n.3). Personal involvement can be shown through allegations of "personal direction or actual knowledge and acquiescences." <u>Rode</u>, 845 F.2d at 1207-08. A showing of actual knowledge must be made with "appropriate particularity." <u>Id.</u>

96 F.Supp.3d 523, 536 (E.D.Pa. 2015) (Jones, II, J.).

Defendants assert that Plaintiff McAndrew has failed to sufficient evidence of Defendant Waltman's personal involvement in his termination. (MSJ 35-36.) In keeping with what appears to be a pattern, Plaintiff McAndrew has failed to respond to Defendants' argument. (<u>See</u> Discussion Part I.A.ii.) Accordingly, the Court finds that Plaintiff McAndrew has failed to create a genuine issue of material fact with respect to Defendant Waltman's personal involvement, and summary judgment on this issue will be granted in favor of Defendants.

## II.   Defendants Are Entitled to Summary Judgment With Respect to Plaintiff McAndrew's Pennsylvania Whistleblower Law Claim.

The Pennsylvania Whistleblower Law (PWL) prohibits an employer from discharging or retaliating against an employee because an employee makes "a good faith report…to the employer or appropriate authority [of] an instance of wrongdoing or waste by a public body." 42 P.S. § 1423(a).[15] In order to state a *prima facie* case, a plaintiff must "show by a preponderance of the evidence that, prior to the alleged reprisal, the employee…reported or was about to report in good faith…an instance of wrongdoing or waste." 42 P.S. § 1424(b); <u>see also</u> O'Rourke v. Commonwealth, 778 A.2d 1194, 1199-1200 (Pa. 2001). The PWL also provides for an affirmative defense, which largely tracks the same-decision defense under First Amendment jurisprudence. 42 P.S. § 1424(c) ("It shall be a defense…if the defendant proves by a preponderance of the evidence that the action by the employer occurred for separate and legitimate reasons, which are not merely pretextual.").

Defendants offer three arguments to support summary judgment in their favor. First, they argue that Plaintiff McAndrew has failed to make good faith complaints of wrongdoing or waste as defined by the statute. (MSJ 36-37.) Second, Defendants assert that even if he did complain about wrongdoing or waste, he could not meet the PWL's high standard of causation. (MSJ 39-

---

[15] The Court notes that it is exercising its supplemental jurisdiction to adjudicate this state law claim. See 28 U.S.C. § 1367(a). The Court possesses original jurisdiction over the First Amendment retaliation claim, and the facts underlying the PWL claim "form part of the same case or controversy under Article III of the constitution." 28 U.S.C. § 1367(a). Accordingly, this Court possesses jurisdiction to adjudicate the PWL claim within 28 U.S.C. § 1367(a). The Court also notes that even though it will apply Pennsylvania substantive law, federal procedural law still controls. <u>See</u> Hanna v. Plumer, 380 U.S. 460, 465 (1965).

42.) And third, even if the Court finds that Plaintiff McAndrew has made the requisite showings under the first two inquiries, Defendants assert that he would have been subject to the same adverse action despite his reports. (MSJ 42.)

### A. Plaintiff McAndrew Has Failed to Offer Sufficient Evidence to State a *Prima Facie* Case

#### i. Standard

In order to state a *prima facie* case under the PWL, a plaintiff must demonstrate that he or she reported an instance of "wrongdoing or waste" as those terms are defined in the statute. O'Rourke v. Commonwealth, 778 A.2d 1194, 1199-1200 (Pa. 2001); see also, 43 P.S. § 1422. The statute defines "wrongdoing" as a "a violation which is not merely of a technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer." 42 P.S. § 1422. The statute subsequently defines "waste" as "[a]n employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources." 42 P.S. § 1422. Accordingly, the PWL "does not protect every critical or damaging report that an employee may make to or about her employer—only those reports of wrongdoing or waste within a narrower meaning of the statute are protected." Johnson v. Resources for Human Dev., Inc., 789 F.Supp.2d 595, 601 (E.D. Pa. 2011).

The Court is also mindful of its obligations pursuant to Federal Rule of Civil Procedure 56 and precedent interpreting that rule. In order to defeat summary judgment, the non-movant must establish that any alleged disputes of fact are both "(1) material, meaning concerning facts that will affect the outcome of the issue under substantive law; and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

#### ii. Application

The Court finds that Defendants are entitled to summary judgment because Plaintiff McAndrew failed to "make a showing sufficient to establish the existence of an essential element" of his case, namely, that any of his complaints qualify for protection under the PWL, which is a question of law. Celotex, 477 U.S. at 322.

1. **Plaintiff McAndrew's Argument Concerning the Motion to Dismiss Opinion is Without Merit**

Before the Court turns its attention to the specifics of Plaintiff McAndrew's complaints, it must first address his argument concerning this Court's opinion resolving Defendants' Motion to Dismiss. McAndrew contends that the Court's opinion "addressed the issues of compliance with the PWL, *including activities and causation*." (Pls.' Resp. 10) (emphasis added). Because the subsequent deposition testimony has "fully tracked" his Complaint and the Court's previous Opinion, McAndrew urges the Court to adopt the findings at the Motion to Dismiss stage. (Pls.' Resp. 10.)

The Court rejects this characterization of its Opinion. In the McAndrew Opinion, the Court made clear that Defendants only challenged McAndrew ability to state causation under the PWL. (McAndrew Mem. Op. 16 n.5) ("Defendants *only move* for dismissal on causation grounds.") (emphasis added). Accordingly, this Court only addressed the causation issue, and did not address whether the PWL protected McAndrew's complaints. Thus, even if the record "fully tracked" McAndrew's complaints, the Court would still have to address whether his complaints qualified for PWL protection.

2. **McAndrew Has Failed to Create a Genuine Issue of Material Fact With Respect to His Complaints**

McAndrew asserts protection under both the "wrongdoing" and "waste" categories of speech protected by the PWL. The Court addresses each in turn.

a. **Plaintiff McAndrew's Claims of Wrongdoing Fail For Lack of Evidence**

In order to state a *prima facie* case, Plaintiff McAndrew must point to Defendants' violation of a specific statute, regulation, ordinance, or code of conduct or ethics. 42 P.S. § 1422; 42  P.S. § 1424(b). The Court notes that the precise question before the Court is *not* whether McAndrew made these statements as a matter of fact. Rather, the Court must determine whether *the substance* of McAndrew's complaints alleged a violation of a *specific* legal or ethical

authority. <u>Sukenik v. Township of Elizabeth</u>, ---A.3d---, 2016 WL 47824 *4 (Pa. Commw. Ct. 2016) ("The report [of wrongdoing] must provide information that is sufficient to identify the law allegedly violated; reports of vague or subjectively wrong conduct are not considered wrongdoing under the [Pennsylvania] Whistleblower Law.") (internal citation omitted); <u>see also</u> <u>Riggio v. Burns</u>, 711 A.2d 497 (Pa. Super. Ct. 1998). The Court finds that Plaintiff McAndrew failed to offer enough evidence of such a violation as to create a triable issue of fact. <u>Celotex</u>, 477 U.S. at 322. The Court will first analyze the firearms, sleeping guard, and vehicle malfunction claims, then proceed with the Policies and Procedures complaint and the Corruption complaint.

### i. Plaintiff McAndrew Not Met His Burden of Proof With Respect to the Firearms, Sleeping Guard, and Vehicle Malfunction Complaints

McAndrew's complaints concerning "firearm safety, certifications, falsification of certifications and armor qualifications" fail for a lack of evidence of a specific violation of a source of legal or ethical authority. (Pls.' Resp. 10.) As evidence for the specific violation, McAndrew points to *Plaintiff Klein's* deposition testimony. (Pls.' Resp. 10.) Therein, Klein states that, "[t]here's a law that requires law enforcement officers to be qualified with firearms and that has to be done by a certified instructor." (Pls.' Resp. 10) (quoting Klein Dep. 32-33). The Court finds Plaintiff McAndrew's position deeply problematic. First, McAndrew provides no explanation of how Klein's belief would be sufficient to undergird his own claim. Second, even assuming that Klein's statement could form the basis of McAndrew's claim, McAndrew has not specified "the law" that the Department allegedly violated. (Pls. Resp. 10.) Third, McAndrew has not offered any precedent that would require this Court to accept Klein's subjective belief concerning the existence of "a law" as evidence of a violation of specific authority. (Pls.' Resp. 10) (quoting Klein Dep. 32-33). Having failed to point to any more specific articulation of a law, <u>see</u> <u>Sukenik</u>, 2016 WL 47824 at *4, McAndrew has failed to create a genuine issue of material fact as it applies to the firearm complaints.

McAndrew's claim concerning a "guard sleeping on the job" and vehicle maintenance fail for the same reasons. In these instances, McAndrew has failed to offer a reference to a violation of a specific provision of a legal or ethical authority. <u>Id</u>. The sum total of McAndrew's defense of the sleeping guard allegation reads: "Both Plaintiffs complained about a Deputy

sleeping while on the job guarding inmates. Such conduct clearly violates the code of conduct and ethics of the Sheriff's Department" (Pls.' Resp. 11.) McAndrew provides a citation to Exhibit U, which contain copies of Plaintiff Klein and Plaintiff McAndrew's termination letters and what appears to be the Sheriff's Department's Human Resources' Policy. (Pls.' Resp. 11.) Similarly, McAndrew's defense of the vehicle malfunction complaint states: "Plaintiffs made complaints about their vehicles lacking proper sirens, and not properly functioning. Not only would ignoring these complaints demonstrate wrongdoing, allowing the vehicle to be in this condition violates the Pennsylvania Motor Vehicle Code." (Pls.' Resp. 11.) In neither case did Plaintiff McAndrew present a reference to a violation of a specific statute, regulation, ordinance, or code of conduct or ethics that would allow this court to identify a law or code specifically violated.[16] See Sukenik, 2016 WL 47824 at *4. Accordingly, McAndrew has failed to create a genuine issue of material fact on this issue, and summary judgment in favor of Defendants is appropriate.

### ii. The Lack of Policies and Procedures Regarding Safety Matters Complaint Also Fails for Lack of Evidence

Before turning to the specifics of Plaintiff McAndrew's failure of evidence, the Court notes that it finds the Pennsylvania Superior Court's decision in Riggio v. Burns to be particularly instructive. 711 A.2d 497 (Pa. Super. Ct. 1998). In Riggio, the Superior Court considered whether a neurologist's complaints concerning a supervising physician's failure to be physically present in the operating room while residents conducted surgical procedures constituted "wrongdoing" for purposes of the PWL. Id. at 498. In support of her position, the plaintiff proffered specific provisions of Pennsylvania statutes that set licensing standards for physicians and healthcare facilities. Id.at 501. The en banc majority of the court determined that "the regulatory statutes cited by [the plaintiff] are entirely too general and vague to permit the conclusion that a violation had occurred amounting to 'wrongdoing' under the Whistleblower Law." Id. Elaborating, the court noted that "because standards such as these are subject to interpretation, and do not specifically define prohibited conduct, it is not at all clear when they would be violated in such a way as to amount to wrongdoing." Id.

---

[16] The Court's own research reveals that the Pennsylvania Motor Vehicle Code contains more than forty chapters, organized into seven different parts. See Title 75 Pa. C.S.A., and that the Human Resources Policy cited by Plaintiff contains more than forty different infractions. (Ex. U 3-4.)

In the case at bar, Plaintiff McAndrew offers the testimony of an expert in support of his claim that the Sheriff's Department's failure to enact specific policies and procedures regarding "safety matters" constitutes a cognizable complaint of wrongdoing. (Pls.' Resp. 10.) Specifically, McAndrew quotes the expert report which states, "[t]his failure to train BCSD deputies in the Constitutional limitations of force falls below national force standards, national force training standards, and other generally accepted force guidelines and recommendations." (Pls. Resp. 10.) Even assuming the admissibility of the expert's testimony, like the evidence proffered in Riggio, McAndrew's evidence of wrongdoing is "entirely too general and vague." 711 A.2d at 501. In fact, the question before this Court is far easier than the one in Riggio, as the plaintiff in that case offered *specific statutory provisions*. Here, the expert offers nothing but formless "generally accepted force guidelines and recommendations" as the basis for a cognizable complaint of wrongdoing. Accordingly, the Court finds that Plaintiff McAndrew has not offered evidence sufficient to create a triable question of fact.

### iii.  Plaintiff's Claim of Corruption Also Fails for Lack of Evidence

At the outset, the Court notes that the PWL only offers protections to employees who make very specific types of complaints. See Johnson v. Resources for Human Dev., Inc., 789 F.Supp.2d 595, 601 (E.D. Pa. 2011).  Thus, even though certain complaints might raise serious issues concerning the integrity of public officials, they cannot provide a basis for a PWL wrongdoing claim unless the plaintiff offers evidence of a specific violation of a statute, regulation, ordinance, or code of conduct or ethics. See id.

Plaintiff McAndrew, and his partner Plaintiff Klein, complained to Bucks County Commissioner Diane Ellis-Marseglia and Bucks County Investigator David Rouland of perceived corruption in the Sheriff's Department. (Statement of Facts Part I.E.) Specifically, they alleged that Sheriff Donnelly required Department employees to participate in political activities on his behalf, and that there existed some kind of vehicle maintenance bid-rigging scheme. (Statement of Facts Part I.E.) However, despite the sensational nature of these claims, the Court finds that Plaintiff McAndrew has failed to provide an adequate foundation to support a PWL wrongdoing claim. In his brief, McAndrew claims that "obviously, corruption constitutes wrongdoing. Plaintiffs complained that there was bid rigging, political paybacks, and improper campaign activities all constituting protected speech under the PWL." (Pls.' Resp. 11.)  However

obvious it may seem that alleged corruption constitutes wrongdoing under the PWL, he has failed to make the requisite showing that Defendants violated a specific statute, regulation, ordinance, or code of conduct or ethics. See Sukenik, 2016 WL 47824 at *4. Accordingly, the Court finds that he has failed to provide evidence from which a reasonable trier of fact could return a verdict in his favor, and summary judgment is therefore warranted.

### b. Plaintiff McAndrew's Claim Predicated on Alleged Waste Also Fails for a Lack of Evidence

The PWL defines "waste" as "[a]n employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources." 42 P.S. § 1422. Here, McAndrew has only offered bald assertions concerning the evidence in this case. The sum of his defense of his PWL claim of waste states: "Plaintiffs have presented evidence that they complained about Sheriff Donnelly ordering Sgt. Browndorf to conduct political activities while on the clock, that weapons certifications were improper, and that the effort to correct the certification issue was false." (Pls.' Resp. 11.) Aside from the fact that this assertion is totally devoid of citation to the record, the Court notes that it is not enough to raise an inference of "substantial abuse, misuse, destruction, or loss of funds." 42 P.S. § 1422. Accordingly, the Court finds that Plaintiff McAndrew has failed to proffer any evidence that would enable a reasonable jury to return a verdict in his favor.

Because McAndrew has failed to make a showing sufficient to establish the existence of an element essential to his case—that he complained of Defendants' wrongdoing or waste as defined by the PWL—and on which he will bear the burden of proof at trial, the Court finds that summary judgment must be granted in favor of Defendants on this claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

**<u>CONCLUSION</u>**

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment, except to the extent that Count I relies on Plaintiff McAndrew's speech before the Browndorf Grand Jury. Accordingly, summary judgment is granted in Defendants' favor on Count I (except to the extent it relies on Plaintiff McAndrew's speech during the Browndorf Disciplinary Hearing) and Count II in its entirety. An appropriate order follows.

BY THE COURT:

/s/ C. Darnell Jones, II

C. Darnell Jones, II    J.